**STATE of Missouri,**
**Plaintiff-Respondent,**

v.

**Kurt Alan PERKINS,**
**Defendant-Appellant.**

No. 52599.

Missouri Court of Appeals,
Eastern District,
Division Three.

May 10, 1988.

S. Lee Patton, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Karen A. King, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Judge.

Kurt Alan Perkins appeals from a jury conviction of first degree murder, § 565.020 RSMo 1986; armed criminal action, § 571.015 RSMo 1986; and stealing, § 570.030 RSMo 1986. He was sentenced for these offenses, respectively, to life imprisonment without possibility of parole, life imprisonment, and seven years imprisonment.

The state's evidence showed that on June 9, 1985, the body of the victim, Harold Messler, 75, was found brutally beaten in his home located in St. Charles, Missouri. Mr. Messler died of "multiple blunt force injuries." The autopsy report showed that Mr. Messler's death was caused by a fracture to the skull, bruises and lacerations to the face, multiple wounds to the front of the neck severing the trachea and windpipe; fractures of several ribs; and a sharp cutting wound to the abdominal area. His throat had been cut and the tip of his left index finger was missing. Mr. Messler had also suffered bruises and lacerations to the back of his hands and arms which the pathologist described as defensive wounds, incurred when he used his hands and arms to deflect blows. The pathologist further testified that when he examined the vic-

tim's face, he found an impression in the skin which resulted from one of the impact wounds. The impression reflected the pattern of the object with which he was struck. The imprint on the victim's face resembled a diamond pattern on the sole of a cleated shoe. A piece of bloodcovered mud was found at the scene of the crime beneath the body of the victim. This evidence was turned over to the crime lab for analysis. The analysis showed that the piece of mud came from a size 4 or 5 vibram sole hiking boot. Appellant owned a pair of red-stringed hiking boots which had a waffle sole that left an imprint similar to that found on the face of the victim. Mr. Messler owned a handgun which was missing following his murder.

On June 10, 1985, two days following the murder, appellant confessed to his brother that he and Bryan McBenge had been harassing Mr. Messler. Karl Perkins, appellant's brother, testified to the facts surrounding the murder. He testified that Bryan and the appellant started beating Mr. Messler with a club. When Mr. Messler fought back, they stabbed him. The two continued to beat Mr. Messler while he begged, "let me live." Appellant began to get worried and told McBenge "let's go." At that point Bryan McBenge said, "Hold up a minute" and cut Mr. Messler's throat.

On June 11, 1985, appellant's brother found a handgun in a K–Mart bag in the door of the freezer. The gun was later identified as belonging to Mr. Messler.

Appellant asked his brother to get rid of a pair of red-stringed hiking boots and a knife.

Appellant also talked about the murder to Terry Lynn Merk, a fellow inmate. Appellant was bragging that he and Bryan McBenge had murdered an old man. Appellant also told Merk that he had taken some money and a gun out of the house, and that he had placed the gun in a freezer.

We reverse and remand for a new trial because of the admission in evidence of a taped conversation between appellant and his brother. Appellant's other assignments of error include: (1) the trial court's failure to grant a mistrial after state's witness

Terry Lynn Merk referred to "another murder" during his direct testimony; and (2) the trial court's refusal to allow appellant to recall a witness, the victim's daughter, and in disallowing the testimony of a criminologist. We will address the remaining two points in the event that these matters will recur on retrial.

The appellant contends that the trial court erred by admitting into evidence the tape recorded conversation and alleges three errors, which we paraphrase:

1. Appellant's Fifth Amendment rights were violated because:

   a. appellant's brother was an agent of the police when he telephoned appellant; and

   b. the taped conversation between appellant and his brother constituted a custodial interrogation;

2. Appellant's Sixth Amendment rights were violated because appellant's brother acted on behalf of the police department to elicit incriminating responses although the police were aware that appellant was represented by an attorney and that he did not intend to make a statement.

3. The trial court erred in admitting the taped conversation between appellant and his brother because the prejudicial impact upon the appellant was far greater than any probative value to the state.

■ We need not reach appellant's Sixth Amendment claim because we hold that use of the tape recorded conversation as substantive evidence against him is barred by the exclusionary rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On August 19, 1985, appellant was incarcerated for burglary and stealing charges. The record reveals that on August 19, four days prior to the August 23rd telephone conversation, St. Charles City Police Detective Mark Erhardt interviewed appellant concerning the murder of Harold Messler. It cannot be clearly ascertained from the record whether the appellant was advised of his *Miranda* rights before the interview.

However, it is clear that appellant indicated to Detective Erhardt that he was represented by a public defender and that *he would not make any statements unless his attorney was present or his attorney authorized him to make statements.* At this point, Detective Erhardt terminated the interview. Appellant informed the police to contact his attorney. Appellant's attorney told the police his client would not make any statements.

Also on August 19, 1985, Detective Erhardt picked up and questioned appellant's brother, Karl Perkins, for four or five hours at the police station regarding a burglary and a leaving the scene of an accident. The record reveals that those two charges were subsequently dropped.

Sometime after the murder, Karl found out that there was a $10,000 reward for information leading to the arrest and conviction of anyone in connection with Harold Messler's death. During a conversation with St. Charles police on August 22, 1985, Karl implicated his brother in the murder of Harold Messler. Karl told police that he did not wish to testify against his brother at trial. He then suggested that he call his brother and discuss the murder over the telephone. The police made arrangements to record the telephone conversation, and Karl Perkins called his brother on August 23, 1985, from police headquarters. In December of 1985, the St. Charles Police Department paid Karl in return for his telephone conversation with his brother in August, 1985.

Assuming the state is correct in its contention that the telephone conversation contained probative value, we must determine if appellant's Fifth Amendment rights were violated by the manner in which the statement was taken. Resolution of this issue involves the question of whether Karl Perkins acted as an agent of the state when he questioned appellant about the murder. Karl, upon agreeing to foster police efforts to inculpate appellant, became an agent of the police. The record indicates that Detective Harvey spoke with Karl Perkins on three occassions in August, 1985. In response to the police offer of money, Karl,

functioning as a conduit, agreed to call his brother to discuss the murder over the telephone. Sometime after making the taped conversation, he was subsequently paid by the police in accordance with their agreement. The police expected that a conversation between appellant and his brother was reasonably likely to elicit an incriminating response from appellant. Because he acted as a police instrumentality, and was paid to elicit incriminating information from appellant, we find that Karl Perkins was, in fact, an agent of the police.

We must next determine whether appellant was "in custody" for purposes of *Miranda* when he made the allegedly incriminating statements to his brother. In *Mathis v. United States* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968), the court found the *Miranda* principle applicable to questioning which takes place in a prison setting during a suspect's term of imprisonment on a separate offense. 88 S.Ct. at 1505.

In *Mathis*, the defendant's conviction rested partially on incriminating statements and documents obtained from him during a tax investigation conducted while defendant was in a Florida state prison serving a state sentence. The Internal Revenue agents had failed to give the *Miranda* warnings. In reversing Mathis' conviction of knowingly filing false claims for tax refunds against the government, the Supreme Court rejected the government's argument that *Miranda* was inapplicable on the grounds that (1) the questions asked were part of a routine tax investigation and (2) defendant had not been put in jail by the agents questioning him, but was there for an entirely separate offense.

In disposing of these contentions the Supreme Court stated:

> These differences are too minor and shadowy to justify a departure from the well-considered conclusions of *Miranda* with reference to warnings to be given to a person *held in custody.* 390 U.S. at 5, 88 S.Ct. at 1505. (emphasis added).

It is clear from the following language that the in-custody status of *Mathis* was the controlling factor of the Court's opinion:

We reject the contention that tax investigations are immune from the *Miranda* requirements for warnings to be given *a person in custody.*

The Government also seeks to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody. In speaking of 'custody' the language of the *Miranda* opinion is clear and unequivocal:

'To summarize we hold that when an individual is taken into custody, or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is in jeopardy.' 384 U.S. at 478, 86 S.Ct. at 1630.

390 U.S. at 5, 88 S.Ct. at 1505 (emphasis added).

Appellant was, without question, "in custody" as defined in *Mathis,* because at the time of the telephone conversation appellant was incarcerated for burglary and stealing charges.

Having concluded that Karl was a government agent and that appellant was "in custody" for purposes of *Miranda,* we must finally determine whether the statements made by appellant during his telephone conversation with his brother were the product of a custodial interrogation.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Court held that "interrogation" under *Miranda* need not amount to actual questioning and may instead be the "functional equivalent" of such questioning. The Court defined the latter to include *"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id.* at 300, 100 S.Ct. at 1689 (emphasis added; footnotes omitted). The Court went on to say that this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. *Id.* at 301, 100 S.Ct. at 1689.

In the instant case, the police arranged the taped conversation between appellant and his brother deliberately to elicit incriminating remarks from appellant. The evidence is clear that the police arranged this conversation four days after appellant refused to speak to them directly, by attempting to elicit an incriminating statement by utilizing the emotional relationship between brother and appellant. From the perception of the appellant, he invoked his Fifth Amendment right to remain silent when he indicated to Detective Erhardt that he was represented by a public defender and that he *would not make any statements unless his attorney was present or his attorney authorized him to make statements.* Subsequently, when appellant spoke to his brother, he did not intend to waive his Fifth Amendment right against self-incrimination. Appellant's *Miranda* rights were violated when the police, through subterfuge and trickery, in the form of a paid agent, elicited statements from appellant—precisely what the police had attempted to accomplish four days previously to no avail.

The state suggests that appellant voluntarily made the statements to a private party, and therefore the telephone conversation with his brother did not constitute police interrogation. However, this is not a case of police obtaining information through misplaced confidence of appellant *because Karl was working directly as a police agent.* In *United States v. Brown,* 466 F.2d 493 (10th Cir.1972), the defendant was convicted of making a false and fictitious statement likely to deceive a gun dealer in the acquisition of a firearm. On appeal, Brown contended that his conviction was premised on evidence obtained as the result of an unlawful police interrogation. Brown was taken into custody and

given his *Miranda* rights. He indicated that he did not want to make a statement and that he desired an attorney. The efforts of the police to obtain information from defendant through direct interrogatories having failed, the police then turned to defendant's friend and "permitted" defendant's friend, Byers, to talk to defendant. The police asked Byers to find out from the defendant the location of the gun in question. Byers spoke with Brown and ultimately provided police with the requested information. The court reversed Brown's conviction, and said:

> It would seem indisputable that defendant's original arrest, the persistent police interrogation, followed by the police-inspired interrogation by Byers, the gun's recovery leading to information of defendant's unlawful purchase of the weapon, and his final conviction present a continuing picture of conduct in complete frustration of the dictates of *Miranda* and side effects contrary to the teachings of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 [(1964)]. This is not a case of information reaching police through the misplaced confidence of defendant. See *United States v. Mitchell*, 7 Cir., 417 F.2d 1246, 1249 [(1969)]. It is a case where police-initiated interrogation continued when Brown had the right to remain silent and have counsel present. Although Byers was appellant's friend, he was functioning as an instrument of the police. He was doing that which the police themselves could not do. This is proscribed by *Miranda*. The evidence obtained as a result of that interrogation should not have been admitted at trial, *Sullins v. United States*, 10 Cir., 389 F.2d 985 [(1968)], and the entire basis for conviction was thus tainted.

*Brown*, 466 F.2d at 495.

When the police resort to tactics of this sort, they trick a defendant into relinquishing important constitutional protections. *See* White, *Police Trickery in Inducing Confessions*, 127 U.Pa.L.Rev. 581, 605 (1979) (footnotes omitted); *see also U.S. v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2188–89, 65 L.Ed.2d 115 (1980); Dix, *Undercover Investigations and Police Rulemaking*, 53 Tex.L.Rev. 203, 230 (1975) (suggesting that a *Miranda*-type barrier should preclude use of the "jail-plant" tactic). If the use of a friend who is, in fact, an agent of the police is proscribed by the Fifth Amendment, certainly the use of a police agent with a self-serving motive to produce is likewise prohibited.

We rely on *State v. McMullan*, 713 S.W. 2d 881 (Mo.App.1986). In *McMullan*, the defendant was in jail awaiting trial on a charge of receiving stolen property when the defendant became the focus of a police investigation into the murder of the owner of the stolen property. Sheriff Nelson conducted the investigation, interrogating defendant on five different occasions. On each occassion Nelson advised defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and on each occasion, defendant made a statement. On the fifth occasion, defendant told Nelson, "I'll tell you the truth, but I want my lawyer present." The interrogation ceased and the attorney who represented defendant on the stolen property charge was called in. Counsel conferred with defendant and then told Nelson there would be no statement and no deals.

Thereafter, Nelson made no direct attempt to elicit incriminating information from defendant. However, one evening Nelson saw defendant "upset," "crying," and "afraid of being beaten up by someone (a cellmate) that was calling him a squealer." The defendant asked to be protected. Nelson transferred defendant to a holdover cell occupied by Danny Pickett, another inmate. Nelson called Pickett to his office and asked Pickett to, in Nelson's own words, "comfort Mr. McMullan (who) was rather upset." Nelson told Pickett to see if he could get McMullan to talk either to Nelson or Pickett about the offense. Pickett agreed to help Nelson after Nelson said he would talk to the prosecutor about Pickett's case. Pickett eventually obtained a written statement from McMullan which led police to discover other evidence implicating defendant in the murder. The prosecuting attorney assured Pickett that in

exchange for Pickett's cooperation the four felony counts pending against him would be dropped.

Defendant moved before trial to suppress the evidence the police had obtained through Pickett, arguing that Pickett, as an agent of the state, had elicited defendant's statement in violation of his Fifth and Sixth Amendment rights to counsel. The trial court, after a hearing, granted the motion and ordered the evidence suppressed. The state appealed from the suppression order.

The court in *McMullan* concluded, as we do here, that the use of defendant's statements and its fruits as substantive evidence against him is barred by the exclusionary rule of *Miranda*. The court stated:

> When a suspect invokes his Fifth Amendment right to have counsel present during a custodial interrogation, as defendant did in this case with the words, 'I'll tell you the truth, but I want my lawyer present,' interrogation must cease until the suspect's attorney is present. *Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723. Moreover, once a suspect expresses his desire to deal with the police only through counsel, as defendant did here when he advised Sheriff Nelson through counsel that there would be no statement and no deals, he may not be subjected to further interrogation unless he himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

. . . . .

The record in this case supports the conclusion that Sheriff Nelson knew, or should have known, that placing Pickett in the hold-over cell with defendant with instructions to get defendant to talk about the murder was, given defendant's anxious state and Pickett's incentive to cooperate, an act "reasonably likely to elicit an incriminating response" from defendant. Pickett's conversation with defendant was therefore the "functional equivalent" of direct police interrogation. *Rhode Island v. Innis, supra.* Pickett interrogated defendant concerning the murder after defendant had plainly expressed his desire to deal with police only through counsel, and the state does not dispute the interrogation was initiated by Pickett. Accordingly, we find interrogation of defendant in this case violated the "bright-line" rule of *Edwards, supra,* that once a suspect has invoked his Fifth Amendment right to counsel he may not be subjected to further interrogation unless he initiates it. 451 U.S. at 484–485, 101 S.Ct. at 1885, 68 L.Ed.2d at 386. Defendant's motion to suppress was therefore properly granted. (Footnote omitted).

*McMullan,* 713 S.W.2d at 883.

Analogous to *McMullan,* the police knew, or should have known, that appellant's brother's phone call was reasonably likely to elicit an incriminating response from appellant. Appellant's brother interrogated appellant concerning the murder after appellant had plainly expressed his desire to deal with police only through counsel. The state does not dispute that Karl initiated the interrogation by calling the appellant.

Karl's interests were so integrated and closely aligned with the police that his role in the case was adversarial in nature and his conduct and questions directed at appellant were accusatory in character. Accordingly, relying on *McMullan,* we find that the telephone conversation, had it been probative, amounted to a functional equivalent of a custodial interrogation. Our holding does not mandate reversal in the situation where the state seeks to introduce a statement by a defendant obtained in a coercive atmosphere, but the statement is not prejudicial to defendant; such statement would otherwise be admissible.

■ However, because the tape here was highly prejudicial and contained minimal probative value to the state, we find the trial court erred in admitting the taped conversation between appellant and his brother. We have scoured the record of the telephone conversation and have not been able to find any incriminating state-

ments made by appellant which are relevant to the murder of Harold Messler. The conversation is filled with references to other crimes, convictions, incarceration of appellant, and a polygraph examination, none of which are related to the instant crime.

Generally, evidence of other crimes is inadmissible. *State v. Bannister*, 680 S.W. 2d 141, 146[13] (Mo. banc 1984), *citing State v. Shaw*, 636 S.W.2d 667, 671, 672[4] (Mo. banc 1982), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982). If proof of the commission of a separate and distinct crime is logically pertinent in that it reasonably tends to prove a material fact in issue in the current prosecution, it is not to be rejected merely because it incidentally proves appellant guilty of another crime. *State v. Martin*, 651 S.W.2d 645, 650[2] (Mo.App.1983). The decision whether to admit evidence of other crimes largely rests on a determination of whether the probative effect of the evidence outweighs its prejudicial impact upon the appellant. *Id.* at 651[6].

Appellant directs our attention to the following statement made by appellant in the telephone conversation:

Appellant: Yeah, I ain't got no conscience is why. So, if you ain't got a conscience you can take it and beat a lie detector test. Why else you think I'm in jail all the time because I ain't got a conscience.

This statement was highly prejudicial as to the character of appellant, and had no relevancy to the instant crime. We also note that in closing argument, the state argued that appellant was guilty because he did not have a conscience.

Additionally, the telephone conversation includes the following colloquy between appellant and appellant's brother which contains several references to other crimes.

Appellant: You sure you're not at the police station. I got to be exact sure. Are you sure?

Appellant's brother: I'm positive.

Appellant: Okay. But, ah, I don't know. There ain't nothing said. With Brian trying to state evidence on me on the, ah, he's saying that I stole a Cadillac one that he stole. He's saying that I stole it and a truck and another car and saying, saying that I did a couple of burglaries.

Appellant's brother: Really?

Appellant: Yeah. He's saying, his charges (unintelligible). He got seven, seven years is all he's getting out of it.

Appellant's brother: I thought you said he got three sevens.

Appellant: Three sevens and bet I'm going to get five sevens. So—

Appellant's brother: If you thought twice you wouldn't, probably wouldn't have done whatever.

Appellant: The whole thing is there wasn't no First Degree Assault, no Second Degree Assault that night. There was a shred of Third Degree Assault, fist fight fifty guys against the two of us.

Appellant's brother: What did they charge you with, First?

Appellant: First and Second. So I don't know.

These references to other crimes have no relevancy to the investigation of the murder of Harold Messler.

The state contends that the trial court did not abuse its discretion in failing to edit out references to other crimes and references which tainted the character of appellant because these references were intertwined with, and inseparable from, evidence relating to the offense charged. The state further argues that the telephone conversation has probative value to the state in the following ways:

1. Appellant refers to his accomplice, Bryan McBenge, and states that he doesn't think that McBenge will talk;

2. Appellant instructs his brother, "Don't get nervous and say anything.";

3. Appellant acknowledges that there are rumors regarding his involvement in a murder;

4. Appellant indicates that he is unwilling to take the lie detector test only because he has been so advised by his attorney; and

5. Appellant and his brother discuss the boots that appellant allegedly wore during the commission of the crime.

We address each contention in turn.

First, it is speculation to assume that appellant's remark that he doesn't think McBenge will talk refers to the instant murder. It is also speculation to assume that appellant's statement to his brother, "Don't get nervous and say anything," refers to the murder of Harold Messler. Third, it would not be unlikely that appellant would suspect that there are rumors regarding his involvement in the murder because on August 19, four days prior to the telephone conversation, he was questioned by a detective concerning his involvement in the death of Harold Messler. Fourth, appellant's statement that his lawyer told him not to take a lie detector test does not connect appellant to the murder. Finally, appellant and his brother did discuss the boots which were similar to those used in the crime. However, in the telephone conversation, appellant denies that he had ever owned a pair of red-string hiking boots. We find that the trial court erred in admitting the taped telephone conversation between appellant and his brother.

■ We next direct our attention to appellant's contention that the trial court abused its discretion in disallowing the testimony of a criminologist, and in refusing to allow appellant to recall a witness.

Appellant argues that his defense "hinged upon the lack of physical evidence linking him to the crime." Appellant's fingerprints were not found at the scene of the crime. Additionally, appellant provided hair samples which were not found to be similar to those found at the crime scene.

We consider it sufficiently likely that the testimony of the criminologist will recur on retrial that we review it herein.

Appellant sought to have C.R. Longwell, a criminologist, testify that the small piece of blood-covered mud found under the body of the victim had fallen from between two lugs of what is commonly known as vibram-soled hiking boots or some similar vibram-soled shoe. In appellant's offer of proof, Mr. Longwell testified that the tests performed on hiking boots purchased from a local store indicated that the piece of dirt came from a shoe sized 4 or 5.

The hiking boots in question were never found and the only evidence linking appellant to a pair of hiking boots came from state's witness, Karl Perkins, who testified that appellant had asked him to throw away a pair of boots that had a waffle sole. The record reflects that appellant wore a size 9½ to 10 shoe.

The state argued that since there was no size 4 or 5 boot found, the evidence sought to be admitted could not be directly linked to the crime. The trial court sustained the state's objection to the admissibility of the evidence on relevancy grounds.

Evidence is relevant if it logically tends to prove or disprove a fact in issue. *State v. Prewitt,* 714 S.W.2d 544, 551[11] (Mo. App.1986); *State v. Sanders,* 619 S.W.2d 344, 348[3] (Mo.App.1981). The piece of blood-covered mud found under the body of the victim tended to disprove the state's contention that on the night of the murder, appellant wore a pair of boots that had a waffle sole that left an imprint similar to that found on the face of the victim. The trial court abused its discretion in refusing to admit evidence of the shoe size found at the scene of the crime.

■ Appellant next contends that the trial court abused its discretion in refusing to allow appellant to recall witness Barbara Lieber in his case-in-chief. Appellant sought to recall Ms. Lieber, the victim's daughter, to have her testify that the victim had been cleaning his house on the day of his death.

Recalling witnesses are matters within the trial court's discretion. *State v. Adams,* 380 S.W.2d 362, 367[4] (Mo.1964); *State v. Mitchell,* 554 S.W.2d 581, 583[6] (Mo.App.1977). Any information should have properly been elicited by cross-examination of the witness during the presentation of the state's case-in-chief. We find no abuse of the trial court's discretion. This point is denied.

Given the foregoing, appellant's contention that the trial court abused its discretion in refusing to grant a mistrial after a state witness referred to "another murder" does not need discussion. We caution the parties on retrial to avoid statements which constitute evidence of other crimes.

The judgment is reversed and remanded for retrial.

KAROHL, P.J., concurs.

SMITH, J., concurs in result.