**STATE of Missouri, Respondent,**

v.

**Jerry Wallace GOFORTH, Appellant.**

**Jerry Wallace GOFORTH, Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 17766, 19161.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 17, 1994.

Rosalynn Koch, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary Moulton Bryan, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant, Jerry Wallace Goforth, was charged with murder in the first degree. § 565.020.[1] He waived his right to trial by jury in exchange for the State's waiver of its right to seek the death penalty. The trial court assented to the waiver. § 565.006.1; Rule 27.01(b).[2]

After hearing the evidence, the trial court[3] found Appellant guilty as charged and sentenced him to imprisonment for life without eligibility for probation or parole. § 565.-020.2. Appellant brings appeal 17766 from that judgment.

While appeal 17766 was pending, Appellant commenced an action per Rule 29.15 to vacate the judgment. The motion court[4] dismissed the action without an evidentiary hearing. Appellant brings appeal 19161 from that order.

We consolidated the appeals, Rule 29.15(*l*), but address them separately in this opinion.

## Appeal 17766

The first of Appellant's two points relied on asserts the trial court erred in denying Appellant's motion to suppress self-incriminating statements and receiving them in evidence, in that the statements were obtained in violation of Appellant's right to counsel during custodial interrogation, guaranteed by Amendments V and XIV to the Constitution of the United States and Article I, § 18(a) of the Constitution of Missouri (1945). Appellant maintains he made the statements "after being subjected to pressure to make a confession by his family who were acting at the behest of the authorities after Appellant had requested counsel."

Appellant's second point avers the evidence was insufficient to support a finding of deliberation, an element of murder in the first degree.

Because of the narrow dimension of the issues presented, we need not set forth all of the evidence supporting the finding of guilty. We shall, however, narrate the evidence pertinent to the two claims of error. In doing so, we are mindful that under Rule 27.01(b), the trial court's finding of guilty has the force and effect of a jury verdict; consequently, we review the case as though a jury had returned a verdict of guilty. *State v. Giffin*, 640 S.W.2d 128, 130[1] (Mo.1982). Evidence that supports a finding of guilty is taken as true and all logical inferences that support a finding of guilty and that may reasonably be drawn from the evidence are indulged. *State v. O'Brien*, 857 S.W.2d 212, 215–16[5] (Mo. banc 1993). Evidence and any inferences to be drawn therefrom that do not support a finding of guilty are ignored. *Id.*

1. References to statutes are to RSMo 1986.

2. Rule references are to Missouri Rules of Criminal Procedure (1991).

3. The crime occurred in Pemiscot County. The case was transferred to Dunklin County on change of venue.

4. Appellant filed the 29.15 action in the Circuit Court of Dunklin County, the sentencing court. Rule 29.15(a). As we understand the record, the 29.15 action was transferred by agreement to the Circuit Court of Stoddard County. No issue is raised about the transfer.

In reviewing the trial court's denial of Appellant's motion to suppress, we will affirm if the evidence is sufficient to sustain the trial court's finding. *State v. Fuente*, 871 S.W.2d 438, 441 (Mo. banc 1994). Deference is given to the trial court's superior opportunity to assess the credibility of the witnesses and weigh the evidence. *Id.* Accordingly, we view the evidence and reasonable inferences therefrom favorably to the trial court's ruling. *State v. Blankenship*, 830 S.W.2d 1, 14[18] (Mo. banc 1992).

So viewed, the evidence establishes that Randy McCloud, Appellant's half-brother, owned a .22 caliber revolver which he kept in his truck. In mid-May, 1990, while he was working with Appellant, McCloud discovered the revolver was missing. McCloud asked Appellant about it. Appellant replied he "didn't get it." At trial, McCloud identified Exhibit 32 as the revolver.

Between 4:30 and 4:45 p.m., June 7, 1990, Appellant arrived at the home of Harold Junior Smith in Caruthersville driving a green "LTD." Appellant asked Smith's teen-age son, John William Smith, whether he wanted to ride to Memphis to see his (John's) brother. John agreed. The duo departed immediately.

En route, John asked Appellant whose car he was driving. Appellant said it was Ola Mae Abbott's. Asked at trial whether Appellant said anything else about Ms. Abbott, John replied, "He told me that he shot her."

Appellant had a gun in the car. Shown Exhibit 32 at trial, John testified it looked like the same gun. John recounted that when they reached Memphis, they sold the gun for ten dollars to Willie Bowls, John's aunt's brother.

Meanwhile, John's father (referred to in the transcript by his middle name, "Junior"), had become suspicious that the car Appellant was driving belonged to Ms. Abbott, described in the transcript as a woman "in her 70's." Junior reported his suspicion by phone to the Pemiscot County Sheriff's Office.

Junior then phoned a friend at Cottonwood Point, asking him to go to the home of Appellant's mother, Pauline Goforth (where Appellant and his wife resided), and ask Pauline whether Appellant had borrowed a car from someone. Pauline, like Ms. Abbott, lived at Cottonwood Point which, according to the testimony, is some twelve miles from Caruthersville.

Junior's friend went to Pauline's home and asked her to phone Junior. Pauline went to her mother's home and phoned Junior. He told her he thought the car Appellant was driving belonged to Ms. Abbott.

Pauline went to Ms. Abbott's home and saw her car was gone. Pauline knocked on Ms. Abbott's door, but there was no answer. Pauline went to a grocery store and discussed the situation with a woman there.

Pauline then returned to Ms. Abbott's home, accompanied by Doris Smith and Doris's daughter-in-law, Debbie Smith. According to Debbie, they arrived about 6:00 p.m. (some 75 to 90 minutes after Appellant had appeared at Junior Smith's home in the LTD).

Debbie and Doris entered Ms. Abbott's home through an unlocked door. They found Ms. Abbott lying on a hall floor. Debbie determined Ms. Abbott had a "very faint pulse." Using Ms. Abbott's phone, Debbie called an ambulance and the sheriff's office.

Deputy Sheriff Stacy Preston Sims was dispatched to Ms. Abbott's home, arriving around 6:30 p.m. He observed Ms. Abbott in the hall. He found no sign of life.

The coroner arrived about 7:00 p.m. Upon examining Ms. Abbott's body, he found three gunshot wounds in the lower abdomen and a laceration on the back of the head. The body was removed to a Caruthersville funeral home, where Stephen Parks, a pathologist, performed an autopsy the following morning. The results are set forth *infra* in our discussion of Appellant's second point.

Deputy Sheriff Rodney Keith Ivie, another participant in the investigation, questioned Appellant's wife. She revealed she and Appellant had been arguing that afternoon. She quoted Appellant as saying he was going to town and steal a car, and for her to walk down the road and he would pick her up.

While the investigation proceeded, Appellant and John Smith—in Memphis—decided to return to the Caruthersville area. They drove back to Cottonwood Point, where Appellant parked the LTD on a levee near the Goforth home. Appellant and John walked from there to the Goforth home. Just before arriving, Appellant threw the car keys in a nearby field.

Appellant and John reached the Goforth home between 10:00 and 10:30 p.m. Appellant's father, J.B. Goforth, testified one of the "kids" said the authorities were looking for Appellant and John for shooting Ms. Abbott. J.B. told Appellant he had "better go on up the Sheriff's Office and get this straight." J.B. and Randy McCloud (Appellant's half-brother, mentioned earlier) took Appellant and John to the sheriff's office. On the way, Appellant told McCloud he took Ms. Abbott's car but did not shoot her.

About 11:00 p.m., Deputy Sheriff Sims was summoned to the sheriff's office by radio because Appellant and John Smith "had arrived and were turning themselves in." When Sims arrived, Appellant and John were "in the front part of the office." Neither had been questioned.

Sims and Appellant went to a "separate office." Using a printed form, Sims read Appellant the "Miranda warnings." [5] Appellant refused to sign a waiver of his rights, saying: "I ain't saying nothing until I speak with my lawyer. I'm not taking the blame for something that I didn't do." Appellant asked to speak to his father and McCloud. Sims noted on the waiver form: "Refused To Sign 11:30 P.M." Sims left the room without questioning Appellant.

Deputy Sheriff Ivie, who had arrived at the sheriff's office around 11:00 p.m., was asked by J.B. Goforth what kind of trouble Appellant was in. Ivie told J.B. that Appellant "was in a lot of trouble because he just committed murder." Ivie added that it would be in Appellant's best interest if he made a statement. Ivie also told J.B. that if Appellant gave a statement and explained what had happened and that he was sorry for it, it would be to his benefit.

According to Ivie, J.B. said, "I'll talk to Jerry."

Sims testified that J.B. and Randy McCloud asked him if they could speak to Appellant. Sims gave them permission, saying it would probably be in Appellant's best interest if he had a side of the story to go ahead and tell it at that time.

J.B. and McCloud entered the room occupied by Appellant. The trio remained there alone approximately 15 minutes.

When J.B. and McCloud came out, McCloud told Sims, "Jerry would like to talk to you now."

Sims reentered the room occupied by Appellant and, in the presence of J.B., again read Appellant the Miranda rights. Appellant signed a written waiver of his rights at 11:45 p.m., and made a three-and-a-half page written statement. J.B. was present during the statement and signed it as a witness. The contents of the statement pertinent to the issues on appeal, slightly paraphrased, are:

"I walked to Ms. Abbott's house from my house. I knocked on the door. She invited me in. I used the phone. I saw Ms. Abbott's gun, a blue .25 automatic pistol, on the counter near the phone. Ms. Abbott pushed me and began calling me vile names. She persisted, and this angered me. I pushed her back. She called me a little sorry bastard. I said f— you, you old bitch. I grabbed the gun from the counter, closed my eyes and pulled the trigger. She was a few feet away in the hallway. I grabbed her keys off the kitchen table and ran outside to the car. I drove the car to John Smith's home and asked him to go to Memphis with me. In the car, I told him I shot at Ms. Abbott but didn't know if I killed her. This is her car. In Memphis, we saw a black guy walking on Poplar Street. John asked him if he wanted to buy a gun. He asked what kind. John said a .25 and handed it to him. He asked how much. I told him $10, I guess. The guy gave John two $5 bills. We rode around Memphis 1½ hours. John said let's go back to Caruthersville. When we ar-

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

rived at Cottonwood I parked the car on top of the levee about ¼ mile from my parents' house. John and I ran across the field to the house. Before I got there I threw the car keys in the grass in a field behind the house. Randy McCloud and my father, J.B. Goforth, brought me to the sheriff's office."

After Appellant signed the statement, a videotape was made of him reading it aloud. Before reading it, Appellant was again advised of his Miranda rights. After reading the statement aloud, Appellant was questioned approximately ten more minutes about some details. He said he pulled the trigger only once, but he thought the gun went off three times. He kept the gun in his hand when he grabbed the car keys and went to the car.

John Smith, questioned by a juvenile officer at the sheriff's office, initially said the gun was sold to a "black guy," but later admitted it was sold to Willie Bowls.

The following day, June 8, a Pemiscot County deputy sheriff went to Memphis and recovered Exhibit 32 (McCloud's .22 caliber revolver, mentioned earlier) from Bowls.

In denying Appellant's motion to suppress the written statement and the videotape statement, the trial court found Appellant knowingly and intelligently waived his right against self-incrimination and his right to have retained or appointed counsel present during interrogation. The trial court further found Appellant's statements were not procured by psychological or physical duress or coercion, or by fear, threats or promises of leniency. The trial court concluded the statements "were freely and voluntarily made."

In arguing his first point, Appellant maintains Sims and Ivie encouraged J.B. Goforth and Randy McCloud to persuade Appellant to make a statement, indicating to J.B. and McCloud that it would be in Appellant's best interests to do so. Appellant asserts: "[T]he actions of the authorities in using [my] relatives in this way constructively amounted to further questioning and interrogation on the part of the deputies and violated [my] Fifth Amendment privilege against self-incrimination."

Appellant emphasizes that a suspect in custody who has expressed his desire to deal with law enforcement agents only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

The applicable law is succinctly set forth in *State v. Mease*, 842 S.W.2d 98, 107[6, 7] (Mo. banc 1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993):

> "As a general principle, once counsel is requested, police officers may not interrogate an accused person further until a lawyer has been provided. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). However, where the accused initiates further communications or conversations with police, no violation of the general principle occurs. *Minnick v. Mississippi*, 498 U.S. 146, ——, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990); *Stumes v. Solem*, 752 F.2d 317, 322 (8th Cir.), *cert. denied*, 471 U.S. 1067, 105 S.Ct. 2145, 85 L.Ed.2d 502 (1985); *State v. Bittick*, 806 S.W.2d 652, 655 (Mo. banc 1991); *State v. Owens*, 827 S.W.2d 226, 227 (Mo.App.1991). Specifically, when an accused has requested counsel but thereafter opens a dialogue with police officers regarding an offense under investigation, and the accused is thereafter advised of his *Miranda* rights and makes a valid waiver of those rights, the accused's statements are admissible. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983)."

Here, when Appellant told Sims at 11:30 p.m. that he was not saying anything until he spoke to his lawyer, Sims terminated the interview without questioning Appellant. Sims did not confront Appellant again until after the 15–minute meeting between Appellant, J.B. Goforth and Randy McCloud, and only after McCloud told Sims that Appellant "would like to talk to you now."

That evidence was sufficient to support a finding that Appellant initiated further con-

versation with Sims through McCloud. When dialogue resumed, Sims advised Appellant anew of his Miranda rights, and Appellant waived his rights before saying anything incriminating. Although the trial court did not expressly find that Appellant initiated the resumption of dialogue with Sims, such a finding is implicit in the trial court's finding that Appellant waived his right to the presence of counsel during interrogation. *State v. Owens,* 827 S.W.2d 226, 228 (Mo.App.E.D. 1991).

In *Owens,* a double murder suspect, after the Miranda warnings, denied knowledge of the crimes. Counsel was thereafter appointed, and the suspect was arraigned. Later, the suspect's mother phoned police because she wanted to disclose a conversation she had with an alleged accomplice. An officer was sent to bring her to the station. En route, she told the officer she had talked to her son on the phone and persuaded him to tell the truth and that a relative had nothing to do with the murders. She said her son agreed he would talk to police and tell the truth. 827 S.W.2d at 228.

The officer went to the jail and told the suspect he (the officer) had received information from the suspect's mother that he wanted to make a statement, wanted to talk. The suspect confirmed that was correct. The officer then advised the suspect of his Miranda rights and questioned him, obtaining an inculpatory statement. *Id.* at 229.

The Eastern District of this Court held the evidence sufficient to support a finding that the suspect initiated the interrogation. *Id.* The opinion pointed out there was no suggestion that the police coached the suspect's mother to prompt the suspect to talk to them. *Id.* The opinion said the test is simply whether "it be the suspect who changes his mind, and not the authorities who change it for him." *Id.*

■ Appellant attempts to distinguish *Owens* by arguing that here, the investigators encouraged J.B. Goforth and Randy McCloud to persuade Appellant to make a statement by indicating it would be in his best interest.

We find no significant difference between the circumstances here and *Owens.* Viewed favorably to the trial court's ruling, the evidence demonstrates that after Appellant initially invoked his Miranda rights, J.B. and McCloud asked permission to speak to him, and he asked to speak to them. The investigators granted those requests, allowing the trio to confer privately. The investigators did not initiate the meeting.

Furthermore, there was no evidence that J.B. or McCloud were surrogate spokesmen for the investigators. Asked what he told Appellant, J.B. testified: "I told him ... if you didn't do it, don't admit to it. But if you done it ... go ahead and tell me you did and it might make it better on you." McCloud testified: "I told him that if he did it say he did. If he didn't, say he didn't."

■ There was no evidence that J.B. or McCloud told Appellant the investigators had made any promise of leniency in return for a statement. We do not ignore Ivie's admission that he told J.B. it would be in Appellant's best interest if he made a statement, explained what happened, and that he was sorry. We likewise do not overlook Sims's admission that he told J.B. and McCloud it would probably be in Appellant's best interest if he had a side of the story to go ahead and tell it.

Such statements have been held not to be promises of leniency, but at most simply expressions of opinion which do not render confessions involuntary. Cases on that subject are extensively discussed in *State v. Pippenger,* 708 S.W.2d 256, 265–66 (Mo.App. S.D.1986). *See also: State v. Crawford,* 719 S.W.2d 11, 12–13 (Mo.App.W.D.1986); *Bolder v. Armontrout,* 921 F.2d 1359, 1366 (8th Cir. 1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 154, 116 L.Ed.2d 119 (1991).

Appellant attempts to liken the instant case to *State v. Perkins,* 753 S.W.2d 567 (Mo.App.E.D.1988). There, a murder suspect (jailed on other charges) invoked his Miranda rights regarding the murder. Motivated by a $10,000 reward, the suspect's brother implicated the suspect in the murder. The police arranged for the brother to telephone the suspect and discuss the murder, with the police recording the conversation. The Eastern District of this Court held the

suspect's statements during the conversation were obtained in violation of his Fifth Amendment rights, in that the brother acted as a police instrumentality and was paid to elicit incriminating information from the suspect, thereby becoming "an agent of the police." *Id.* at 570.

Here, the investigators offered J.B. Goforth and Randy McCloud nothing to induce them to talk to Appellant, did not request that they do so, and did not monitor the conversation. *Perkins* does not apply. Appellant's first point is denied.

■ Appellant's second point avers the evidence was insufficient to support a finding of deliberation in that it "failed to establish beyond a reasonable doubt that Appellant at any time coolly reflected and deliberated upon committing a homicide upon the victim."

Section 565.020.1 reads:

"A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter."

Section 565.002(3) defines "deliberation" as "cool reflection for any length of time no matter how brief."

Appellant maintains the only details of the shooting appear in his confessions, and that they demonstrate he "shot the victim in a rage during the midst of a heated argument."

We reject Appellant's thesis that his confessions are the sole source of details about the shooting.

First, the confessions are demonstrably false in stating Ms. Abbott was shot with a *.25 caliber automatic pistol* seized by Appellant from a counter in her home.

Evidence supportive of the conviction established that Appellant stole Randy McCloud's *.22 caliber revolver* some three weeks before the homicide. The evidence further supports a finding that McCloud's revolver was the gun that fired the fatal shots. As reported earlier, in the videotape statement Appellant said that after the shooting, he kept the gun in his hand when

he grabbed the car keys and went to the car. There was no evidence that Appellant and John Smith had any other gun in the car en route to Memphis. Obviously, McCloud's revolver (Exhibit 32) was the gun Appellant and John sold to Bowls in Memphis, as that was the gun recovered from Bowls the following day and identified at trial by McCloud. Furthermore, as we have seen, John testified Exhibit 32 looked like the gun they sold.

Consequently, the only logical inference is that Appellant entered Ms. Abbott's home armed with McCloud's .22 revolver. He did not obtain the gun that fired the fatal shots by grabbing it off the counter.

Second, the evidence supports an inference that Appellant went to Ms. Abbott's home intending to steal her car. His wife told Deputy Ivie she and Appellant had been arguing, that he said he was going to town and steal a car, and for her to walk down the road and he would pick her up. Given this evidence, the trial court was not obliged to believe Appellant killed Ms. Abbott because a squabble escalated and he shot in rage.

Third, J.B. Goforth testified he asked Appellant "why he did it," and Appellant said because he "had to have a way to go." To J.B., that meant Appellant had to have a car to go somewhere.

Finally, the autopsy revealed Ms. Abbott died as the result of penetrating small caliber gunshot wounds to the abdomen and chest, which caused internal hemorrhage. The pathologist opined the gun was fired from a distance of at least two feet.

■ As noted earlier, there were three separate gunshot wounds. Deliberation has been inferred from evidence of multiple wounds. *State v. Barnes,* 740 S.W.2d 340, 344 (Mo.App.E.D.1987); *State v. Dickson,* 691 S.W.2d 334, 339 (Mo.App.E.D.1985); *State v. Hurt,* 668 S.W.2d 206, 215 (Mo.App. S.D.1984). Because the gun Appellant used was a revolver, it was necessary for him to pull the trigger three separate times to fire three shots.[6] The trial court could have rea-

---

**6.** It is common knowledge, hence we take judicial notice, that a revolver fires only one bullet

upon each pull of the trigger. *See:* 9 Collier's

sonably found Appellant falsely said in his confessions that the gun was an automatic because he wanted to convince investigators he pulled the trigger only once, lending credibility to his story that he shot when suddenly enraged.

 Deliberation may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying. *State v. Stallings,* 812 S.W.2d 772, 777[3] (Mo.App.E.D.1991); *State v. Stewart,* 714 S.W.2d 724, 725[2] (Mo.App. E.D.1986). It is not necessary that the killer brood over his actions for an appreciable period of time. *State v. Armbruster,* 641 S.W.2d 763, 765[2] (Mo.1982).

We hold the evidence, viewed favorably to the conviction, was sufficient to support a finding of deliberation, as statutorily defined. Appellant's second point is denied, and the judgment is affirmed.

### Appeal 19161

 The motion court dismissed Appellant's Rule 29.15 action because Appellant did not file it within the time allowed by Rule 29.15(b). The rule provides that if an appeal is taken from the judgment sought to be vacated, the 29.15 motion must be filed within 30 days after the filing of the transcript in the appeal.

The transcript in appeal 17766 was filed in this Court December 27, 1991; Appellant filed the 29.15 motion in the motion court on March 9, 1992. The motion court so found.

Appellant does not dispute those findings. However, he asserts:

> "... the absolute deadline imposed by Rule 29.15(b) operated to arbitrarily deny Appellant his right to due process of law ... in that the rule makes no provision for the late filing of a postconviction motion for good cause shown."

Appellant candidly acknowledges the Supreme Court of Missouri has rejected an identical constitutional challenge to Rule 29.-15. *Smith v. State,* 798 S.W.2d 152 (Mo. banc 1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2043, 114 L.Ed.2d 127 (1991). Appel-

lant states he raises the issue for the purpose of preservation in the event a federal court renders a decision contrary to the Supreme Court of Missouri.

We are constitutionally controlled by decisions of the Supreme Court of Missouri. Mo. Const., Art. V, § 2 (1945); *Wilson v. State,* 818 S.W.2d 723, 725[1] (Mo.App.S.D.1991). Accordingly, we reject Appellant's constitutional attack on the time limit in Rule 29.-15(b).

The order of the motion court dismissing Appellant's 29.15 action is affirmed.

FLANIGAN, P.J., and GARRISON, J., concur.

Encyclopedia, *Firearms,* p. 740 (Macmillan, Inc.    1987).