**STATE of Missouri, Respondent,**

v.

**Damon BELL, Appellant.**

**No. WD 59083.**

Missouri Court of Appeals, Western District.

Sept. 18, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Oct. 30, 2001.

Application for Transfer Denied Dec. 18, 2001.

Jeremiah W. (Jay) Nixon, Attorney General, Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, for Respondent.

Jeannie M. Willibey, Asst. Public Defender, Kansas City, for Appellant.

Before SMITH, P.J., and SMART and HOWARD, JJ.

EDWIN H. SMITH, Presiding Judge.

Damon Bell appeals the judgment of his jury conviction in the Circuit Court of Platte County for robbery in the first degree, § 569.020,[1] for which he was sentenced, as a prior offender, § 558.016, to a term of imprisonment of thirty years in the Missouri Department of Corrections.

The appellant raises three points on appeal. In Point I, he claims that the trial court erred in allowing, over his objection, the State's fingerprint expert to testify with respect to the match she found between his "suspected known prints" in Exhibit 9 and the palm print found at the crime scene because her testimony was inadmissible hearsay in that she had no personal knowledge that the suspected known prints were actually those of the appellant. In Point II, he claims that the trial court erred or plainly erred in accepting the jury's guilty verdict on the first degree robbery count and its not guilty verdict on the armed criminal action (ACA) count, without returning the jury for further deliberations on both counts, because the verdicts were inherently inconsistent, allowing his conviction on first degree robbery without the jury finding him guilty beyond a reasonable doubt as to each and every required element of proof for that offense, which violated his right to due process. In Point III, he claims that the trial court erred in overruling his motion for judgment of acquittal notwithstanding the verdict because his conviction for robbery in the first degree was not supported by the evidence in that the only evidence introduced by the State to show that the appellant committed the offense was his partial palm print lifted from the scene of the crime, which was insufficient to establish, beyond a reasonable doubt, his identity as the perpetrator.

We affirm.

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

## Facts

On April 2, 1998, Judy Havens was working as the night auditor at the Wyndham Garden Hotel in Platte County, Missouri. Her shift was from 11 p.m. until 7 a.m. At approximately 3:45 a.m., three men entered the lobby of the hotel. The tallest of the men went down the hallway towards the bathroom. The other two men remained in the lobby asking Havens for directions to fast food restaurants in the area. After three to five minutes, the men left.

Approximately five to ten minutes after the three men left, two of them returned, including the tallest. The other man went down the hallway towards the bathroom, while the tallest of the two approached the counter where Havens was working, pulled a gun and said, "I guess you know this is a holdup." He then put one hand on the counter, using it for leverage as he vaulted over the counter. He was not wearing gloves, and the counter had been wiped clean approximately twenty minutes earlier. While pointing the gun at Havens, he directed her to open the cash register, which she did. The robber then took the cash, approximately $180, asking her if that was all of it. She replied that it was. He then walked back into the sales office and grabbed Havens' purse, which contained two or three dollars in cash. He jumped back over the counter, again placing his hand on the counter for support. Both men then ran out of the hotel. Havens immediately triggered the silent alarm and called 911.

The police arrived approximately twenty minutes after the alarm was triggered. Havens told the police that during the robbery she was focused on the gun and did not get a good look at the robber's face. However, she did see his face in profile as he was rifling through the cash drawer. She identified the robber as a fairly tall, lighter-skinned African–American man in his twenties, wearing a navy blue top and a blue stocking cap pulled down very low over his face, whose "nose had a little bump on it." Havens also told the police that the robber had put his hand on the counter, and that between the time it was cleaned and the time of the robbery, no one else had been in the lobby or touched the counter. The police cordoned off the counter area to preserve the crime scene. Around 5:00 a.m., Ian Ledoux, a crime scene technician with the Kansas City Police Department (KCPD), dusted the counter where the robber had placed his hand, identifying several possible prints. Ledoux lifted five cards of prints, which he sent to the Fingerprint Identification Unit (FIU).

Kathleen Hentges, a certified latent print examiner with the KCPD, received the five latent lift cards from Ledoux on April 3, 1998. Four of the cards contained prints of no value in that there was either no ridge detail or not enough to conduct a comparison to a set of known prints. The fifth card, however, did contain a viable palm print, which Hentges compared with the appellant's suspected known prints, which resulted in a match.

After a series of similar robberies took place in both Missouri and Kansas, the robbery unit of the KCPD, with the assistance of the Metro Wide Task Force, which was composed of representatives from various law enforcement agencies located in the metropolitan Kansas City area, began to compile information about possible suspects. Based upon this information, the Task Force arrived at a possible suspect, Antoan Ford. The KCPD ran Ford's name through its computer system, which printed a list of Ford's known associates. The appellant's name appeared on the first page of that list. The KCPD then sent known prints of Ford, the appellant,

and two other individuals to the FIU for comparison with the latent print taken from the scene of the crime, resulting in a match. Based on the match and the fact that a witness at one of the other robberies had described the perpetrator as wearing his hair in cornrows, as did the appellant, the appellant was subsequently taken into custody for questioning on November 30, 1998, at Harrah's Casino in North Kansas City, Missouri..

On December 1, 1998, from approximately 1:40 a.m. to 5:06 a.m., KCPD Detectives James Herrington and Wes Patterson questioned the appellant about the robbery at the Wyndham Hotel. Prior to questioning, Herrington read the appellant his *Miranda* rights. However, the appellant refused to sign a form to that effect. Herrington asked the appellant why his palm print was found at the scene of the robbery. The appellant denied any involvement in the robbery. At 4:10 a.m., the detectives drove the appellant to the Wyndham Hotel and asked him if there was any reason why his prints would be found on the hotel counter. The appellant answered, "No."

A warrant was issued for the appellant's arrest on December 1, 1998. He was charged by indictment with one count of first degree robbery, § 569.020, on December 9, 1998. The indictment alleged that he "forcibly stole U.S. Currency in the possession of Wyndham Hotel, and in the course thereof [he] displayed what appeared to be a deadly weapon[.]"

On March 7, 2000, the State filed a motion, pursuant to Rule 25.06(B)(3), for an order directing the appellant to be re-fingerprinted. In its motion, the State alleged that a second set of prints were needed because of a lapse of time since the first prints were taken and the officer who took those prints would likely be unavailable to testify at trial. The motion was heard and sustained on March 16, 2000.

On June 14, 2000, the court held a hearing to determine the appellant's status as a prior and/or persistent offender. The court found that the appellant was a prior offender, pursuant to § 558.016. The State then filed an information in lieu of indictment on June 14, 2000, charging the appellant, as a prior offender, with first degree robbery and ACA, § 571.015.

A jury trial was held in the Circuit Court of Platte County before the Honorable Abe Shafer on June 19–20, 2000. At the close of the State's case and at the close of all of the evidence, the appellant filed motions for judgment of acquittal, which were denied. The case having been submitted, the jury returned a verdict of guilty as to first degree robbery and a not guilty verdict as to ACA. The jury was polled at the request of the appellant's trial counsel. All of the jurors confirmed the verdicts, which were then accepted by the court.

The appellant filed a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial on July 17, 2000. The motion was heard and overruled on September 14, 2000. The court sentenced the appellant, as a prior offender, to thirty years imprisonment, to run consecutively with a fifteen-year sentence that he was already serving on an unrelated conviction.

This appeal follows.

## I.

In Point I, the appellant claims that the trial court erred in allowing, over his objection, the State's fingerprint expert to testify with respect to the match she found in comparing his "suspected known prints" in Exhibit 9 with the palm print found at the crime scene because her testimony was

inadmissible hearsay in that she had no personal knowledge that the suspected known prints were actually those of the appellant. We disagree.

■■■ "Hearsay is defined as 'in-court testimony of an extrajudicial statement offered to prove the truth of the matters asserted therein, resting for its value upon the credibility of the out-of-court declarant.' " *State v. Mayes,* 868 S.W.2d 541, 544 (Mo.App.1993) (*quoting State v. Harris,* 620 S.W.2d 349, 355 (Mo. *banc* 1981)). "Generally, hearsay is objectionable because the one making the statement is not under oath or subject to cross-examination." *State v. McNeal,* 986 S.W.2d 176, 179 (Mo.App.1999) (*citing State v. Newson,* 898 S.W.2d 710, 716 (Mo.App.1995)). The appellant contends that Hentges' expert testimony as to Exhibit 9 was hearsay and did not fall within any of the recognized exceptions to the hearsay rule, such that the trial court erred in allowing it. The State contends that her testimony was not hearsay in that it was not offered for the truth of the matter asserted, but rather to show subsequent police conduct. "[A]ll out-of-court statements are not hearsay which must be excluded unless shown to fall within a recognized exception." *State v. Foust,* 920 S.W.2d 949, 954 (Mo.App. 1996). "If the statement is not offered for the truth of the matter asserted, there is no basis for requiring the proponent of the testimony to fit within an exception to the hearsay rule because the testimony is not hearsay." *Id.* Testimony elicited to explain subsequent police conduct and to supply background and continuity is non-hearsay and is admissible. *McNeal,* 986 S.W.2d at 179 (*citing State v. McElroy,* 838 S.W.2d 43, 46 (Mo.App.1992)).

■■■ In contending that Hentges' testimony, as to the comparison between the suspected known prints in Exhibit 9 and those lifted from the crime scene, was not

hearsay because it was offered to explain subsequent police conduct, the State asserts that it was made necessary by her unexpected, voluntary disclosure during direct examination that she had made two comparisons. In this regard, the record reflects:

Q. And let me ask you, with respect to State's Exhibit Number 15, there appears to be some writing on the front of the card in red and then some notation on the back of the card as well, next to a red mark. I'll ask you to look at those two sets of notation?

A. On the reverse side of the lift card, I initialed this lift card stating that I received it on 4–3 of '98, through the mail, which is the inter-department mail system, my initials and five cards.

Q. And is that the red writing that's on the reverse side of the card?

A. Yes, sir.

Q. And then on the other side of the card next to the red mark, there appears to be some notation?

A. Yes, sir. I made an examination of this latent print to a set of known prints of Damon Bell and positively identified the left palm impression of Damon Bell.

Q. And is that your notation where you've made the comparison?

A. Yes. I actually made two examinations on this, because I took a set of known inked prints myself and re-examined the prints.

As a result of Hentges' voluntary disclosure, the jury was made aware of the fact that there were two sets of the appellant's prints and that both were compared to the prints taken from the crime scene. Thus, the State felt compelled to explain to the jury the circumstances as to why two sets of prints were taken. As to the State's explanation to the court as to why it was necessary for Hentges to testify about the

first comparison of prints, the record reflects:

Q. And did you initially have submitted to you some suspected known prints of Damon Bell to do a comparison to that lift card?

A. Yes, I did.

Q. And you bring that with—did you bring the set of known inked prints that you used to make your comparison to court with you today?

A. Yes, I did.

Q. Can I have that, ma'am?

MR. LOCKE: Your Honor, could we approach the bench, please?

THE COURT: You may.

(Whereupon, counsel proceed to the bench where the following proceedings were had:)

---

MR. KETCHMARK: Just for your information, this is what we're referring to as State's Exhibit Number 9. What I informed Mr. Locke is I'm not intending to offer this exhibit. This is the suspected known prints that were taken by a officer-trainer. Miss Hentges did her initial comparison to the latent lift card to this and was able to find 10 points of comparison that she identified Damon Bell.

It was on the basis of that-that we subsequently filed the motion asking Mr. Bell to be reprinted by Miss Hentges, which I think was sustained without objection.

I'm not intending to offer this. I'm merely going to explain why Miss Hentges is subsequently printing Mr. Bell herself. So I wanted to mark this and have her testify that this is suspected known prints that were submitted for her to do a comparison and that would explain why she subsequently was asked to print Mr. Bell herself and what her conclusions were.

I think, when I explained that to Mr. Locke, he wanted to approach.

MR. LOCKE: Your Honor, I'd like to object. I know he's not gonna offer it into evidence, but he's gonna offer evidence about her testimony from Miss Hentges. And he wants her to say, "I examined this card which says to me that it was from Damon Bell. And I examined it and that's how I can say that these prints were Damon Bell's."

They don't have any evidence to substantiate that these are in fact Damon Bell's prints. So I object to her giving any testimony about identifying Damon Bell from these prints.

I don't know why she can't just say, "I printed Mr. Bell on such and such a date. And I compared those known prints of his that I took to these fingerprints and that they matched."

This is just kinda tryin' to bootstrap in this much earlier set of prints that have not been substantiated as being Mr. Bell's.

MR. KETCHMARK: And Judge, in order to explain why she's printing Mr. Bell, I think we have a right to get in that it was an earlier print card. And I can provide The Court with case law, if you would like, because we did essentially the same thing in State of Missouri versus Kenneth Carr.

Mr. Locke can question her about she doesn't know that this was in fact Damon Bell. She didn't take these known prints and she can establish that, but I think in order for the jury to understand why she's going out and printing Mr. Bell, this is how she got there.

She started with what was suspected to be his known prints, made a determination that it matches. And so then she comes in and I requested reprints of Mr.

Bell. And that's what the testimony is going to be.

But in order to adequately explain to the jury why she's doing what she's subsequently doing, I think we need to be able to discuss this with her.

THE COURT: Anything further on your objection, Mr. Locke?

MR. LOCKE: Just that I don't think that any of that testimony is necessary. I don't know why she can't just say, "I was asked by the Prosecutor to print Mr. Bell. And I took those prints and I compared them and they match."

He's asking her to testify about conclusions she drew, based on the representations made on this document without any showing that this document belongs to Mr. Bell. And that is just improper hearsay testimony. It is testimony based on this hearsay that is contained in Exhibit Number 9.

THE COURT: Objection overruled. Proceed.

MR. LOCKE: Thank you.

(The proceedings returned to open court.)

---

(Whereupon, an item was marked as State's Exhibit Number 9 for identification.)

Q. Now Miss Hentges, I'm going to show you what's been marked as State's Exhibit Number 9 and ask you if this was the suspected known prints of this defendant, Damon Bell, that you used in comparing them to State's Exhibit Number 15?

A. Yes. What's marked State's Exhibit Number 9 is a set of known inked—

MR. LOCKE: Your Honor—

A.—prints.

MR. LOCKE:—Your Honor, all right. I object to that, because she has no knowledge of where those prints came from. She's testifying about what somebody else put on that card unknown to her.

THE COURT: Objection overruled. Proceed.

Q. And Miss Hentges, in comparing the suspected known prints of this defendant, Damon Bell, as contained in State's Exhibit Number 9 and the latent lift card in State's Exhibit Number 15, were you able to make a determination as to if there was a match?

A. Yes, I did.

Q. And what was your expert determination?

A. I positively identified the left palm impression of Damon Bell.

Q. And how many points of comparison did you find?

A. Twelve.

Q. After—I assume that information would have been forwarded to the police department, or to the detectives?

A. That is correct.

Q. And at some point, at my request, did you-yourself come into contact with Damon Bell?

A. Yes, I did.

Q. And what was the purpose in you coming into contact with him?

A. For me to fingerprint him.

Q. Do you recall, Miss Hentges, when that would have happened?

A. Yes. I did that on March 16th of 2000.

Hentges went on to testify as to the results of the second comparison of prints, concluding that there was a match based on sixteen points of comparison.

Under the circumstances, it was reasonable for the State to offer Hentges' testimony to explain why a second set of prints was taken. If the State had not undertak-

en to explain why a second set of prints was taken and a second comparison was done, it was faced with a situation where the jury would have been left to speculate that the reason for this was that the first comparison was not favorable to the prosecution. Inasmuch as the critical evidence against the appellant was Hentges' testimony concerning the fingerprint comparison, the State was reasonably concerned about any testimony that might cast doubt in the minds of the jury as to the reliability of this evidence. Thus, the challenged testimony was not only logically relevant, but legally relevant to explain the subsequent conduct of Hentges in taking the second set of prints and comparing them to the latent palm print lifted from the counter. As such, the testimony was not hearsay and was admissible.

■ Even assuming, *arguendo*, that Hentges' testimony was hearsay and it was, therefore, error to admit it without an exception to the hearsay rule being shown, the appellant would not be entitled to a reversal of his conviction unless he could also show that he suffered prejudice as a result thereof. *State v. Duncan*, 27 S.W.3d 486, 488 (Mo.App.2000) (citations omitted). The State contends that no prejudice occurred because "any testimony relating to Exhibit 9 was merely cumulative to virtually-identical, properly-admitted evidence." We agree.

■ When improperly admitted evidence is merely cumulative of other evidence properly admitted at trial, its admission is not prejudicial, reversible error, unless it is outcome determinative. *Moss v. State*, 10 S.W.3d 508, 512 (Mo. *banc* 2000). "A finding of outcome-determinative prejudice 'expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a

reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence.'" *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. *banc* 2000) (*quoting State v. Roberts*, 948 S.W.2d 577, 592 (Mo. *banc* 1997)).

■ Here, the jury heard testimony from Hentges as to both fingerprint comparisons, both of which resulted in a match. Thus, even if her testimony as to the results of the first comparison was erroneously admitted, it was merely cumulative of her properly admitted testimony concerning the second comparison. This is so in that it is reasonable to conclude that even if the evidence as to the first comparison had been excluded, the jury would have still found the appellant guilty based upon Hentges' testimony concerning the second comparison. In other words, for the appellant to claim that without this evidence as to the first comparison the jury would not have convicted him is, in our view, unreasonable.

Point denied.

## II.

In Point II, the appellant claims that the trial court erred or plainly erred in accepting the jury's guilty verdict on the first degree robbery count and its not guilty verdict on the ACA count, without returning the jury for further deliberations on both counts, because the verdicts were inherently inconsistent, allowing his conviction on first degree robbery without the jury finding him guilty beyond a reasonable doubt as to each and every required element of proof for that offense, which violated his right to due process. Specifically, he claims that the jury's verdicts were inherently inconsistent in that, in order to convict him of both counts submitted, both verdict directors submitting the offenses required the jury to find, beyond

a reasonable doubt, that he used a gun in robbing the hotel such that in finding him not guilty of ACA, the jury necessarily found that he did not use a gun and thus, could not have found, as required by due process, all of the requisite elements of the offense of robbery in the first degree.

The appellant concedes that there may be some question as to whether his claim of error in this point was properly preserved for review and requests plain error review, pursuant to Rule 30.20, if we find that it was not. The question arises due to the appellant's failure to object to the trial court's acceptance of the jury's verdicts without returning it for further deliberations thereon. Because we find, *infra*, that the verdicts were not inconsistent such that the trial court did not err in accepting them, it does not matter whether we review for plain error or otherwise. Thus, we need not decide whether the appellant's claim in this point was properly preserved for our review.

■ Whether the jury's verdicts were inconsistent, requiring the trial court to return the jury for further deliberations on both counts, is a question of law. As to questions of law, we review those *de novo*. *State v. Rousseau*, 34 S.W.3d 254, 259 (Mo.App.2000) (citations omitted). Thus, our review here is to determine whether the application of the controlling law to the record supports the court's action of not returning, *sua sponte*, the jury for further deliberations on its verdicts.

■ "It is well settled in the law that the trial court has a duty to examine the verdict or verdicts returned by the jury for defects, ambiguities, and inconsistencies." *State v. Hibler*, 21 S.W.3d 87, 95 (Mo.App. 2000) (*citing State v. Zimmerman*, 941

S.W.2d 821, 824–25 (Mo.App.1997)). When an inconsistency is found between two verdicts by the trial court, rather than speculate as to what the jury intended, it is preferable to return the jury for further deliberations. *State v. Peters*, 855 S.W.2d 345, 348–49 (Mo. *banc* 1993). In cases where ACA is submitted in a separate count from the underlying felony and the jury attempts to return inconsistent verdicts with respect to those two counts, the giving of MAI–CR 3d 312.06 is required. It reads:

> The Court cannot accept your verdicts as written. The verdicts are inconsistent as to Count(s) _____ [Specify counts that are inconsistent]. You should examine your verdicts in light of all of the instructions. Do not destroy any of the verdict forms.

It goes without saying that to succeed on his claim of error in this point, the appellant has the burden of first showing that the verdicts were inconsistent. As discussed, *supra*, the appellant contends that the jury's verdicts were inconsistent in that the verdict directors for both offenses required proof of an identical element, the use of a gun, and thus, in returning a verdict of not guilty as to ACA, the jury necessarily found that he did not use a gun, which should have precluded it, under the verdict director given, from returning a guilty verdict as to first degree robbery. We would agree with this contention, *if*, in fact, the gun element in the ACA verdict director was identical to that in the first degree robbery verdict director, as asserted by the appellant. This is so in that, in order to convict the appellant of ACA, under § 571.015.1, the State only had to prove two elements: (1) he committed the underlying felony of robbery;[2] and (2) he did so by, with, or

---

**2.** Of course, this *one* proof element of ACA necessarily requires the proof of *all* the elements of the underlying felony.

through the use, aid, or assistance of a deadly weapon, *State ex rel. Westfall v. Ruddy*, 621 S.W.2d 42, 43 (Mo. *banc* 1981); *State v. Danikas*, 11 S.W.3d 782, 789 (Mo. App.1999), such that in returning a guilty verdict on the robbery count, the jury could only have returned a not guilty verdict on the ACA count by finding that the State had failed to prove the second or gun element of that offense.

■ The State contends that the jury's verdicts were not inconsistent in that the gun elements of the two offenses, as instructed by the trial court in the verdict directors, were not identical as the appellant contends. In that regard, the State asserts that the gun element of its verdict director for first degree robbery only required that the jury find that the appellant *appeared* to use a gun in committing the robbery; whereas, the gun element of the ACA verdict director required the jury to find that he *actually* used a gun. Consequently, they argue that the jury, under the instructions given, could have found that he used what appeared to be a gun in committing the robbery so as to convict him as to that offense, but was not convinced beyond a reasonable doubt that it was actually a gun, requiring the jury to acquit him of ACA. We agree.

The appellant was charged with robbery in the first degree, under § 569.020, and ACA, under § 571.015.1. Section 569.020 reads, in pertinent part:

1. A person commits the crime of robbery in the first degree when he forcibly steals property and in the course thereof he, or another participant in the crime,

(1) Causes serious physical injury to any person; or

(2) Is armed with a deadly weapon; or

(3) Uses or threatens the immediate use of a dangerous instrument against any person; or

(4) Displays or threatens the use of what appears to be a deadly weapon or dangerous instrument.

Section 571.015.1 reads, in pertinent part:

... any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the crime of armed criminal action....

Consistent with these sections,[3] the jury was instructed on the robbery count in Instruction No. 7, patterned after MAI–CR 3d 323.02, and on the ACA count in Instruction No. 8, patterned after MAI–CR 3d 332.02. Instruction No. 7 reads, in pertinent part:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about April 2, 1998, in the County of Platte, State of Missouri, the defendant took U.S. Currency, which property was in the possession of Wyndham Garden, and

Second, that the defendant did so for the purpose of withholding it from the owner permanently, and

Third, that defendant in doing so threatened the immediate use of physical force on or against Judy Havens for the purpose of preventing resistance to the taking of the property, and

Fourth, that in the course of taking the property, the defendant displayed or threatened the use of what *appeared* to be a deadly weapon or dangerous instrument. Then you will find the defendant guilty under Count I of robbery in the first degree.

---

**3.** The appellant does not challenge on appeal the verdict directors given by the trial court.

(Emphasis added.) Instruction No. 8 reads, in pertinent part:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that defendant committed the offense of robbery in the first degree, as submitted in Instruction No. 7, and

Second, that defendant knowingly committed the offense by or with or through the *use* of a deadly weapon, Then you will find the defendant guilty under Count II of armed criminal action.

(Emphasis added.) As the State contends, in paragraph fourth of the robbery verdict director, the jury was only required to find that he used what appeared to be a deadly weapon, a gun, in robbing the hotel, whereas in paragraph second of the ACA verdict director, it was required to find that he actually used a gun. Thus, the State is correct in its contention that the gun elements of the two offenses were different, such that under the evidence presented and the instructions given, the jury could have returned a guilty verdict as to the robbery count, while returning a not guilty verdict on the ACA count.

Our analysis is supported by the holding in *State v. Turner*, 723 S.W.2d 527 (Mo. App.1986). There, as here, the defendant was charged with first degree robbery and ACA, and was found guilty of robbery, but not guilty of ACA. *Id.* The charges were submitted pursuant to instructions identical to those given in our case. *Id.* On appeal of his convictions, the defendant claimed that "the conviction on the robbery count and the acquittal on the [ACA] count was inherently inconsistent." *Id.* at 528. In holding that the instructions were not inconsistent, the *Turner* court stated:

The robbery conviction required jury findings that the [appellant] (1) took property, (2) threatened the immediate use of physical force, and (3) displayed

or threatened the use of what appeared to be a deadly weapon or dangerous instrument. In order to convict [the appellant] of the additional [ACA] charge, the jury had to find [the appellant] *used* a deadly weapon. It chose not to do so, apparently believing [the appellant] perpetrated the robbery by using what *appeared* to be a deadly weapon. There was no inconsistency in the verdicts since the jury did not believe beyond a reasonable doubt [the appellant] had a real gun.

*Id.* (emphasis in original).

For the reasons stated, we find that, as a matter of law, the verdicts were not inconsistent, and the trial court did not err in accepting the verdicts then without ordering further deliberations.

Point denied.

## III.

In Point III, the appellant claims that the trial court erred in overruling his motion for judgment of acquittal notwithstanding the verdict because his conviction for robbery in the first degree was not supported by the evidence in that the only evidence introduced by the State to show that the appellant committed the offense was his partial palm print lifted from the scene of the crime, which was insufficient to establish, beyond a reasonable doubt, his identity as the perpetrator. Specifically, he claims that the palm print alone was insufficient to convict in that there was no credible evidence to establish that the print was recent and was left at the time of the crime. We disagree.

"When reviewing the sufficiency of evidence supporting a criminal conviction, the Court does not act as a ' "super juror" with veto powers,' but gives great deference to the trier of fact." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. *banc* 1998)

(*quoting State v. Grim,* 854 S.W.2d 403, 414 (Mo. *banc* 1993)). Thus, our review "is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* (citations omitted). "In applying this standard, 'the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary.' " *Id.* (citation omitted). Finally, "the court neither weighs the evidence, nor determines the credibility or reliability of the witnesses." *State v. Daleske,* 866 S.W.2d 476, 478 (Mo. App.1993) (*citing State v. Middleton,* 854 S.W.2d 504, 506 (Mo.App.1993)).

 The appellant concedes in his brief that our appellate courts have routinely recognized the fact that a fingerprint at the scene of the crime may in and of itself be sufficient to convict. *See State v. Grim,* 854 S.W.2d 403, 413 (Mo. *banc* 1993); *State v. Bland,* 757 S.W.2d 242, 245 (Mo.App.1988) (*citing State v. Thomas,* 452 S.W.2d 160, 163 (Mo.1970)) (holding that due to the reliable and unique quality of an individual's fingerprint, fingerprint evidence, by itself, is enough to support a criminal conviction). However, he contends that "a partial palm print in a place accessible to the public, without credible evidence establishing that the print was recent or occurred near the time of the crime, should not be deemed sufficient to sustain a conviction, even if the defendant does not recall or denies ever having been at that public place."

In contending as he does in this point, the appellant ignores the fact that the hotel clerk testified that approximately twenty minutes before the robbery, the counter had been cleaned and that no one other than herself and the robber had touched the counter between the time it was cleaned and the time the police lifted the prints from the counter. This was sufficient to establish that the palm print on the counter was recent and occurred near the time of the crime. The fact that there were prints lifted from the counter, other than the appellant's partial palm print, which were found to be of no value, does not refute the clerk's testimony that the counter was clean prior to the robbery. What the appellant fails to consider in his argument is the fact that the prints were all lifted from the same area, such that it could be inferred that the other prints were left by the appellant's fingers on his first trip over the counter or possibly by his hand the second time over the counter, after taking what he wanted. In contending that the fingerprint evidence was insufficient to convict, the appellant also fails to consider that he claimed never to have been in the hotel, which left unexplained how his print could have been left in any event, recent or otherwise. Such a denial in the face of physical evidence placing him at the scene of the crime is powerful evidence of consciousness of guilt, sufficient to convict. *Bland,* 757 S.W.2d at 245–46.

Point denied.

### Conclusion

The judgment of the circuit court convicting the appellant of first degree robbery, § 569.020, is affirmed.

SMART and HOWARD, JJ., concur.