**STATE of Missouri, Plaintiff–Respondent,**

v.

**Darian SEIBERT, Defendant–Appellant.**

No. 24741.

Missouri Court of Appeals, Southern District, Division One.

March 12, 2003.

Motion for Rehearing or Transfer Denied April 3, 2003.

Application for Transfer Denied May 27, 2003.

John M. Schilmoeller, Assistant State Public Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, for respondent.

PHILLIP R. GARRISON, Judge.

Darian Seibert ("Defendant") was convicted, following a bench trial, of second degree murder, a violation of Section

565.020.1,[1] and first degree arson, a violation of Section 569.040.1, for his role in a fire that killed Donald Rector ("Victim"). He received concurrent sentences of life in prison and twenty-five years' imprisonment. On appeal, Defendant alleges trial court error in proceeding to trial without a jury, and in allowing the State to introduce an inculpatory statement he made to police while in the hospital. We affirm.

Defendant does not challenge the sufficiency of the evidence supporting the conviction. Viewed in a light most favorable to the judgment, the evidence demonstrated that Defendant's mother, Patrice Seibert ("Patrice"), lived in a mobile home in Rolla, Missouri with her five sons, including Defendant. Victim, a seventeen-year-old "friend" who took medication for a mental disorder, also lived with them. On February 12, 1997, Patrice awoke to find that her twelve-year-old son, Jonathan, had died in his sleep. Afflicted with cerebral palsy, Jonathan suffered from seizures, was blind, could neither walk nor talk, and could not feed himself. Another of Patrice's children, Michael, left the home to find Defendant, who at seventeen was Patrice's eldest child, and inform him of the situation. Michael found Defendant at the home of Derrick Roper ("Roper") and Jeremy Batcher ("Batcher"). The three had been drinking gin and vodka and using marijuana the night before, and resumed those activities sometime before Michael's arrival that morning. Michael told Defendant that Jonathan was dead, and the two returned to Patrice's house where Defendant told her to contact the police. Defendant then returned to the home of Batcher and Roper, where they resumed playing cards.

Patrice was afraid to contact the police because Jonathan had "sores" and she feared the police would accuse her of child neglect. Michael again went to Defendant and told him Patrice was "going crazy." Defendant, Roper, and Batcher went to the trailer and devised a scheme to burn the trailer to "cover-up" Jonathan's death. The plan called for Defendant and Roper to obtain gasoline with funds provided by Patrice, who was also to send her two youngest children, Patrick and Shawn, to church that evening then leave the area.[2] Finally, Defendant and Roper were to set the trailer on fire.

Before the plan was carried out, the group (now consisting of Defendant, Roper, and Patrice) discussed the need for "someone . . . to be there" when the trailer burned so as not to arouse suspicion by leaving the severely handicapped Jonathan to be found alone. They decided to use Victim for that purpose.

Defendant and Roper then went to three different stores in search of a gas can, bought one, filled it with gasoline, and called a cab to take them near the trailer park. Roper left the can in nearby woods as he did not want someone to see him with it. Then, the two went to the trailer and waited for the appropriate time to go forward with the plan.

Later, when school was out, Patrick and Shawn returned to Patrice's home. The next arrival at the trailer was Victim, followed by Patrice and Roper. Still later, Patrice sent her younger sons, Patrick and Shawn, to church and Patrice packed a bag and some money and left the premises with a male friend of hers. With Victim asleep and the others gone, Roper retrieved the gas can from the woods and started pouring gasoline through the trail-

---

1. All references to statutes are to RSMo (2000) unless otherwise indicated.

2. The whereabouts of Michael at this time are not disclosed by the record.

er. When some of the gasoline got on Defendant, he went outside to wipe it off. When he re-entered the trailer, he saw Roper in the back bedroom, hitting Victim, who was apparently convulsing from a seizure. When Defendant went to that area of the trailer house, he heard a screeching sound; immediately thereafter, the gasoline ignited.[3] Before Roper and Defendant were able to escape through the front door, the trailer was engulfed by fire. Defendant was severely burned at this time, but did not die. Victim, who had been left behind, died from asphyxiation.

While in a hospital receiving treatment for his burns, police questioned Defendant, who made an inculpatory statement. Prior to trial, Defendant filed motions to suppress the statement, which were overruled. During Defendant's trial, the court admitted Defendant's statement into evidence over his objection. Other evidence at Defendant's trial included testimony he had given at Patrice's earlier trial on the same charges. The court found Defendant guilty of second-degree murder and first-degree arson and sentenced him as indicated above. This appeal followed.

■ Defendant's first point alleges that the trial court erred in proceeding to trial without a jury and without what he characterizes as a valid waiver of jury trial. The jury was excused when Defendant's counsel announced, after voir dire and opening statements, that "the defense would waive jury trial on behalf of [Defendant]." Defendant was present when this announcement was made, and the assistant attorney general representing the State said he had no objection to a waiver of a jury trial. The trial court also said it had no objection

and that the request would be honored. A docket entry confirms those proceedings.

■ First, we note that Defendant made no objection to the waiver of a jury, and the issue was not raised in his motion for new trial. As a result, this alleged error has not been properly preserved for appellate review. *State v. Martin*, 940 S.W.2d 6, 9 (Mo.App. W.D.1997). Defendant acknowledges this fact, but requests that we grant relief for plain error. Rule 30.20[4] permits, but does not require, us to review for plain error substantially affecting the rights of a defendant, which resulted in a manifest injustice or miscarriage of justice. *State v. Reynolds*, 997 S.W.2d 528, 532 (Mo.App. S.D.1999). More than a mere showing of demonstrable prejudice is required. *Id.* Rather, prejudice exists, under the "plain error" rule, only where the error complained of impacts so substantially upon the rights of a defendant that manifest injustice or a miscarriage of justice will result if left uncorrected. *State v. Cooksey*, 805 S.W.2d 709, 711 (Mo.App. W.D.1991). The burden of proving manifest injustice or miscarriage of justice is on the defendant. *State v. Mayes*, 63 S.W.3d 615, 624 (Mo.banc 2001). Plain error review should be used sparingly and should not be used to justify the review of every point that has not properly been preserved. *State v. Williams*, 18 S.W.3d 461, 464 (Mo.App. E.D.2000). In this case, we review *ex gratia* Defendant's claim of plain error.

■ Rule 27.01(b) provides, in pertinent part:

(b) The defendant may, with the assent of the court, waive a trial by jury and submit the trial of any criminal case to the court, whose findings shall have the

---

3. There was some indication in the record that the fire started when the furnace came on.

4. All references to rules are to Missouri Rules of Criminal Procedure (2002) unless otherwise indicated.

force and effect of the verdict of a jury. In felony cases such waiver by the defendant shall be made in open court and entered of record.

Such waiver "must appear from the record with unmistakable clarity." *State v. Bibb*, 702 S.W.2d 462, 466 (Mo. banc 1985).

*State v. Hatton*, 918 S.W.2d 790 (Mo. banc 1996), is similar to the instant case. There the defendant's attorney stated to the judge that his client was "waiving jury." *Id.* at 795. This statement was made in the presence of the defendant, who offered no objection then or at any time during trial. *Id.* As in the instant case, the defendant did not argue that he waived his right to a jury trial involuntarily, or that he intended to exercise that right despite his attorney's statement. *Id.* Rather he argued, as does Defendant here, that the trial court's procedure was inadequate to establish an intentional relinquishment of the right to trial by jury. *Id.* Specifically, he argued that the trial court should have conducted an independent examination and made a separate determination that the waiver of a jury trial was intentional. *Id.* In *Hatton*, the supreme court assumed "for argument's sake" that the trial court should have conducted a more thorough examination to determine the defendant's understanding of his waiver. It said, however, that "it does not follow that the trial court's failure to do so necessarily results in a reversal of his conviction." *Id.* As in the instant case, the review in *Hatton* was for plain error. In *Hatton*, the court was unable to find plain error because, at trial, the defendant admitted to the crime with which he was charged. *Id.* The supreme court said, those "admissions were sufficient to remove any concern that the waiver of the jury trial resulted in prejudice." *Id.*

■ In the instant case, Defendant was present when his attorney announced the decision to waive a jury. He made no objection then or at any time thereafter until this appeal. At trial, the court took judicial notice of Defendant's testimony from his mother's earlier trial involving the same offenses. Defendant's attorney announced that he had no objection to the court doing so, and conceded that it was a judicial admission. In that testimony, Defendant admitted being part of the plan to burn the trailer with the Victim in it; to assisting in acquiring the gasoline used; that he did nothing to stop Roper from spreading the gasoline throughout the trailer; and that he lied to investigators after the fire, telling the same story Roper had told. In his statement given to investigators, which was also introduced into evidence, Defendant said that after Roper doused the inside of the trailer with gasoline, they were discussing "how are we gonna lit [sic], light it up," when the gasoline ignited prematurely. These circumstances, like those in *Hatton*, remove any concern about the waiver of the jury trial resulting in prejudice to Defendant. We also remain mindful of the fact that Defendant does not contest the sufficiency of the evidence to support the convictions.

Defendant argues that the facts of this case are more closely akin to those in *State v. Rulo*, 976 S.W.2d 650 (Mo.App. S.D. 1998), than to *Hatton*. We disagree. In *Rulo*, the transcript of the proceedings and the docket entries contained no record that the defendant had waived his right to a jury trial. *Id.* at 651. This court concluded that such failure to fulfill any requirements of Rule 27.01(b) required a reversal of the conviction and a remand for a new trial. *Id.* at 653. Here, in contrast, the announcement of the waiver, and the trial court's acceptance of it, were in the record of the proceedings, as was the fact that Defendant was present and voiced no objection. Having failed to establish plain

error requiring relief under the criteria discussed above, this point is denied.

Defendant's second point alleges that the trial court committed reversible error when it overruled his motions to suppress and allowed the State to introduce, over his objection, an inculpatory statement he made to police while in the hospital. Defendant contends his Fifth and Sixth Amendment rights to counsel were violated based on the fact that he made an unambiguous and unequivocal request for counsel at the beginning of the interview in question.

■ "When reviewing a trial court's ruling on a motion to suppress, [our] inquiry is limited to whether the court's decision is supported by substantial evidence." *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc), *cert. denied*, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). In such a review, we consider the facts and all reasonable inferences from those facts in the light most favorable to the trial court's ruling. *State v. Rodriguez*, 877 S.W.2d 106, 110 (Mo. banc 1994). As in all matters, however, we review questions of law *de novo*. *Rousan* at 845.

■ On March 31, 1997, while still hospitalized for treatment of burns he suffered in the fire, Defendant was questioned by Officer Richard Hanrahan ("Hanrahan") in a recorded interview. Hanrahan began the interview by asking for Defendant's name and birthdate. He then started to inform Defendant of his *Miranda* rights. Defendant stated during and immediately after the reading of these rights that he wanted to talk with a lawyer. Hanrahan continued the conversation, referring to evidence that had been gathered, and eventually read Defendant his rights a second time. Defendant then proceeded to make the statements that are the subject of this point, and in which he described the events surrounding the fire.

■ The Sixth Amendment right to counsel attaches when adverse judicial proceedings are initiated. *State v. Beck*, 687 S.W.2d 155, 160 (Mo. banc 1985). Given that charges had not yet been filed when Hanrahan interviewed Defendant in the hospital, no judicial proceedings against Defendant had started at the time he gave the statement. Thus his Sixth Amendment rights were not implicated.

■ Defendant also bases this point on his rights under the Fifth Amendment as interpreted by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There the Supreme Court said that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. 1602. The Court also said that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* *Miranda* was clarified in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981), when the Court said that "*Miranda* thus declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation." *Id.* at 482, 101 S.Ct. 1880.

■ The *Miranda* right to counsel is not triggered, however, during non-custodial interrogations. *State v. Brown*, 18 S.W.3d 482, 483 (Mo.App. E.D.2000). The Supreme Court has never expanded the *Edwards* (and, therefore, the *Miranda*) principles to non-custodial requests for counsel. *Id.* at 484–85, 101 S.Ct. 1880 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 2211 n. 3, 115 L.Ed.2d 158 (1991) ("[w]e have in fact never held that a person can invoke his *Mi-*

*randa* rights anticipatorily, in a context other than 'custodial interrogation' ")).

In fact, Defendant acknowledges the requirement that interrogation be "custodial" before the Fifth Amendment right to counsel arises, and argues that he was "in custody" for those purposes when Officer Hanrahan questioned him. Defendant argues that several factors in the record support this contention. Specifically, he argues that he was physically unable to leave the burn unit of the hospital where he was interrogated; he was only at the hospital for the time necessary to treat his injuries; it was clear when Officer Hanrahan interrogated him that he would be charged because his mother, Patrice, and Roper had already been charged; he "was not free to leave on his own at the time of the interview"; and he was transported to the county jail upon his release from the hospital. We find Defendant's argument in this regard unpersuasive.

First, the fact that Defendant was in the hospital does not establish that the interrogation was "custodial" in nature. In *State v. Schnick*, 819 S.W.2d 330 (Mo. banc 1991), our supreme court considered whether a defendant who was hospitalized when interviewed by an officer concerning murders with which he was subsequently charged was a custodial interrogation requiring a *Miranda* warning. *Id.* at 335. There, the defendant claimed he was "deprived of his freedom" because he was in the hospital when interviewed. The supreme court disagreed, holding that the fact that a police interview occurs in the hospital, by itself, does not require a *Miranda* warning. *Id.* It said:

> This argument misapprehends what is meant by "deprived of his freedom." Defendant was not under arrest or restraint by [the officer] or any other law enforcement officer. Defendant could have stopped [the officer's] interview at any time and directed [the officer] to

leave the room. Because the defendant was free to terminate the interview and require [the officer] to leave, the coercive aspects of a custodial interrogation were not present.

*Id.* at 334. As in *Schnick*, the record here does not indicate Defendant was prevented from halting the interview at any time and directing Hanrahan to leave the hospital room. *See also State v. Middleton*, 854 S.W.2d 504, 516 (Mo.App. W.D.1993) (" 'Custodial interrogation' occurs only when the suspect is formally arrested or is subjected to arrest-like restraints").

Second, the fact that Defendant may have been a suspect at the time of the Hanrahan interrogation does not establish that it was "custodial" within the *Miranda* criteria. *See State v. Isa*, 850 S.W.2d 876, 894 (Mo. banc 1993). Even if a person is a suspect in a crime, there is no custodial interrogation when he is not under arrest or otherwise restrained of his liberty at the time of the questioning. *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo.banc 1991). *See also Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977) (*Miranda* does not apply simply because the person questioned is a suspect).

Defendant was not arrested until sometime after the Hanrahan interview when he was released from the hospital, and there is nothing in the record indicating that he could not have terminated the Hanrahan interview at any time. In short, the record does not support Defendant's contention that the Hanrahan interrogation was custodial within the framework of the authorities discussed above. That being the case, his request for counsel did not trigger a *Miranda* right to counsel during that interview. *Brown* at 483.

Finally, even if the interview in question had been custodial in nature, Defendant would not be entitled to the reversal of his convictions and a remand for the new trial

he seeks. The testimony Defendant gave when Patrice was tried on the same charges was introduced in his own trial without objection. As indicated earlier, in that testimony Defendant admitted involvement in the crimes for which he was convicted. In *State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998), the defendant sought to exclude a statement he gave to authorities, arguing that he had invoked his right to counsel during an interrogation, but that the request had not been honored. The Missouri Supreme Court held that there was other evidence in the case supporting the defendant's conviction and that, even if error, the admission of his statement was harmless. The same is true here. Defendant's second point is denied.

The judgment of the trial court is affirmed.

MONTGOMERY, P.J., and BARNEY, J., concur.