**STATE of Missouri, Respondent,**

v.

**Byron CASE, Appellant.**

No. WD 61626.

Missouri Court of Appeals,
Western District.

April 13, 2004.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 1, 2004.

Application for Transfer Denied
Aug. 24, 2004.

Sarah W. Patel, Kansas City, MO, for appellant.

Andrea K. Spillars, Jefferson City, MO, for respondent.

Before ELLIS, C.J., HAROLD L. LOWENSTEIN and HOWARD, JJ.

HAROLD L. LOWENSTEIN, Judge.

Byron C. Case appeals from his convictions of first-degree murder, § 565.020.1, RSMo. (1999),[1] and armed criminal action. § 571.015.1. He was sentenced to life without parole on the murder count and a concurrent life sentence for armed criminal action. He contends that there was insufficient evidence to convict him, since the testimony of one of the State's key witnesses was marred by contradictions and was uncorroborated. He also contends that the trial court violated the rules of evidence by allowing the State to admit into evidence certain pre-arrest statements (which the State argued were tacit admis-

---

1. All statutory references are to RSMo. (1999) unless indicated otherwise.

sions); and that by doing so, the trial court plainly violated his constitutional rights. This court affirms.[2]

## FACTS

In the fall of 1997, Anastasia Witbols Feugen ("Anastasia") was shot and killed in Lincoln Cemetery, located between Independence and Kansas City. Her body was found on October 23, 1997, with a large gunshot wound to her face. Anastasia was shot with either a rifle, shotgun, or high-powered handgun fired less than six inches away from her face. If Anastasia's head were upright when she was shot, the angle of the gun would have been slightly upward. Anastasia was five feet, two inches tall.

Late in the evening of October 22, 1997, Anastasia had been riding in a car with Justin Bruton ("Justin"), her former fiancé, who had had an on-again, off-again relationship with Anastasia and who had broken off their engagement in the summer of 1997; Justin's friend, the defendant, Byron C. Case ("Case"), who is five feet, eight inches tall; and Kelly Moffett (Kelly), Case's then-girlfriend. The day after Anastasia's body was found, Case and Kelly gave a statement to the police in which they said: On October 22, 1997, Justin, Kelly and Case picked Anastasia up at a Dairy Queen in Independence and drove to Washington Cemetery, which was across the street from Lincoln Cemetery. The four left Washington Cemetery after the groundskeeper signaled to the four that they had to leave. *En route* to Kansas City, the car stopped at the I-435 and Truman Road intersection and Anastasia jumped out, because she was upset with Justin. Anastasia had asked Justin why he didn't love her anymore, and Justin had

said he didn't know. According to Case and Kelly's statement, that was the last time they had seen or heard from Anastasia.

The next day, Justin killed himself with a shotgun.

For a long while, Kelly and Case's version of events gelled. Kelly repeated her initial statement to the police on November 20 and December 10, 1997, and on August 22 and August 25, 1998. In July 1999, with his lawyer present and after being informally granted limited use immunity (the prosecutor agreed not to use Case's statement unless Case knowingly provided false information to the police), Case did the same.

However, in March 2000, three years after her original statement to the police, Kelly—an admitted crack addict and alcoholic who was living in crackhouses, having been kicked out of her parents home—changed her story. She called her mother from a crackhouse and said that she saw Justin kill Anastasia. Sometime later, she told her father that it was Case who had killed Anastasia. Then, while in drug rehabilitation, she told her counselor it was Justin. Confronted by her mother, who said, "But Kelly you told your dad that [Case] killed Anastasia," Kelly flip-flopped yet again, saying that Case had killed Anastasia.

Kelly eventually told the police, in September 2000, that Case was Anastasia's killer. She told the police that she had seen Case shoot and kill Anastasia at Lincoln Cemetery. Kelly made this statement to the police a few days after she learned that Case had moved to St. Louis and had attempted to end all contact with

2. Case's second point shall be addressed first because the sufficiency of the evidence may turn on whether the statements Case made to Kelly were properly admitted as evidence of guilt.

her, refusing to give her his new phone number and address.

At the urging of the police and after being granted transactional immunity pursuant to Section 491.205, Kelly agreed to phone Case and record her conversations with him. On June 25 and June 27, 2001, she did this, using equipment supplied by the police. In the June 5th conversation, which happened around 1:30 a.m., Kelly told Case, who was at his residence:

[The police have] called a bunch again. They called while I was in re-hab, they showed up out here. Yeah. I don't understand, like seriously, what all went on or whatever, and I seriously, I hate to say this, but why, seriously, why did you have to kill her? What was the whole fucking big deal? Could you explain that to me? Because I don't get it. Seriously. Justin's dead for no reason, she's dead for no reason. It's just all fucked up. And for some reason they're talking to me, because you won't talk. So I'm fucked. And it makes me look horrible because everybody already knows that I'm a fucking crack-head, that I'm a coke-head, that I'm an alcoholic and don't remember shit. And if I tried to talk to them, nothing's going to add up. So, I mean if you could seriously explain to me as to why you actually felt the need to kill her, then that would really help me feel better about the whole fucking thing. I mean, was there seriously any reason to all this?

Case responded by saying, "We shouldn't talk about this." Kelly said, "Why?" Case then repeated, "probably because we shouldn't talk about this."

In the June 7th conversation, Kelly told Case:

They've been calling me like every single day to come in, and I need to get the story straight and figure something out because they've literally been calling me

every single day for the past week bugging me, like when can I come in, when can I come in, and if I can't come in out there, they'll come to me and all this stuff.

Case responded by saying, "I mean the only advice that I can give is start everything with I think, or the best I can remember is . . . there."

Case was arrested and tried for murder in the first degree and armed criminal action. At trial, Case's responses were admitted, over defense counsel's objection, as tacit admissions of guilt. Kelly testified to the following: On the night of October 22, 1997, after Kelly got into Justin's car, Case and Justin told her that Case had agreed to kill Anastasia for Justin because Justin thought it would be "better, easier if she were gone." According to Kelly, Justin said that Case—and not Justin— would kill Anastasia because Justin didn't think he could do it, whereas Case, who had a "weird fascination with death," had always wanted to kill somebody. When they arrived at Lincoln Cemetery, Case and Kelly were sitting in the back seat, Case behind the driver's seat. Anastasia and Justin got out, to talk about their relationship. Kelly then asked Case "why on earth" Case was going to kill Anastasia. Case said, "We [meaning Justin and he] have been talking about it all day, and Justin asked me to do it. And I want to do it, so I'm going to do it." Case stepped out of the car, popped the trunk, and pulled out a long gun. Justin yelled at Case to stop. Case didn't. He put the gun on his shoulder, aimed at Anastasia, and fired, causing her to fall to the ground. Justin and Case got in the car, and drove off, later discarding the murder weapon in an industrial area near railroad tracks.

On cross-examination, Kelly admitted that Justin had been on LSD shortly before Anastasia was shot, that, in the past,

Justin had hatched some "odd plans about hurting people," including a robbery scheme and a scheme to blow up a church, and that two weeks before Anastasia was shot, Justin had been hearing voices. In addition to suggesting that Justin might have killed Anastasia, the defense counsel also argued that Anastasia was the victim of a "random act of violence from some unknown stranger"—the very words used by defense counsel in his opening statement. In his testimony, Case repeated, in substance, his earlier statements to the police. A mechanic who worked at a gas station located 100 feet from the Truman Road–I–435 intersection confirmed Case's story, testifying that the evening of October 22, 1997, he saw an attractive young woman, approximately five foot, six or seven inches tall, get out of a car at the intersection and walk in the direction of Lincoln Cemetery. The mechanic also testified that on either the 23rd or the 24th, he identified Anastasia as the girl in question after being shown two pictures (one of Anastasia) by the police.

The jury returned guilty verdicts on both counts. Case filed this appeal.

## I.

■ Case argues that the trial court violated his right to fundamental fairness, as safeguarded by the Fifth and Fourteenth Amendment, by allowing the State to admit into evidence, as part of its case in chief, the telephone conversations recorded by Kelly and the written transcriptions thereof. This point has two prongs: First, he contends that his responses were not tacit admissions, thus rendering them inadmissible hearsay; second, even if they were tacit admissions, it was fundamentally unfair to allow the State to use his responses as substantive evidence of guilt.[3]

Review of the admissibility of evidence is for an abuse of discretion. *State v. Barriner*, 111 S.W.3d 396, 400 n. 4 (Mo. banc 2003).

### A. TACIT ADMISSIONS

■ The admission of a party opponent is not hearsay. *State v. Gilmore*, 22 S.W.3d 712, 718 (Mo.App.1999).

■ A defendant makes a tacit admission of guilt when the defendant fails to respond to or significantly acquiesces in the import of an inculpatory statement (e.g., by making an equivocal, ambivalent, or evasive response, *People v. Riel*, 22 Cal.4th 1153, 96 Cal.Rptr.2d 1, 998 P.2d 969, 995 (2000)) when the inculpatory statement: (1) was made in the presence and hearing of the accused, (2) was sufficiently direct, as would naturally call for a reply, and (3) was not made at a judicial proceeding, or while the accused was in custody or under arrest. *State v. Gilmore*, 22 S.W.3d at 718.

■ Cases first statement that we shouldn't talk about this, is in no wise different from the defendants in *State v. Gilmore*. In that case, defendant Gilmore, who was also on trial for murder, had said, after being asked whether he had killed a white man, Man, shut the f—k up. *Id.* at 715, 718. This court held that the trial court did not abuse its discretion in concluding that the defendants statement was a tacit admission, and admitting it into evidence. *Id.* at 718. Both Case and Gilmores statements reflect a desire not to talk about the topic raised by the interlocutor; both are non-responsive to veiled suggestions of murder. Because Gilmores response, which could have reasonably been interpreted as a vehement denial of

---

**3.** Because each prong gives an independent reason for reversal, the two prongs should have been expressed as separate points relied on.

responsibility, was a tacit admission, then so was Cases, since it cannot be reasonably interpreted as a denial of responsibility.

Cases attempts to distinguish *Gilmore* are unavailing. That other statements and questions surrounded Kellys accusation, as Case points out, does not detract from the directness of her accusation. These surrounding statements and questions do not qualify or negate her accusation, but rather explain why she is seeking an explanation for the killing. And while it is true that Kelly never asked Case whether he had killed Anastasia, or flatly accused him of killing Anastasia, her comments made clear her belief that Case had killed Anastasia. Kellys accusation was especially likely to elicit a reply, since what she was saying contradicted the story she and Case had given the police.

Granted, Case was trying to get Kelly to change the topic of discussion, but so was defendant Gilmore. Moreover, it is precisely Cases attempt to evade responding to Kellys accusation that makes his response a tacit admission. *See* McCormick on Evidence 262, at 405 (5th ed. 1999) (Since it is the failure to deny that is significant, an equivocal or evasive response may similarly be used against [a] party ... but if the total response adds up to a clear-cut denial, this theory of implied admission is not properly available.); 3 Charles E. Torcia, Whartons Criminal Evidence 701 (13th ed.1973). *See also Riel,* 96 Cal.Rptr.2d 1, 998 P.2d at 995; *Doisher v. State,* 658 P.2d 119, 120 (Alaska 1983); *Wickliffe v. State,* 424 N.E.2d 1007, 1009 (Ind.1981); *State v. Thompson,* 59 N.J. 396, 283 A.2d 513, 520 (1971) (holding that defendants "No comment" reply to question, "You didn't do that, did you Ben?" was tacit admission).

Case argues he had strep throat and a 103–degree fever and was "out of it" when he talked to Kelly on June 5th—though the jury was not bound to believe Cases testimony, *State v. Kimberley,* 103 S.W.3d 850, 857 (Mo.App.2003). Even so, the judge and the jury could have reasonably believed that that Case nevertheless heard Kelly's accusation. Though the conversation took place around 1:30 a.m., Cases response was not off-point, as one would expect if he hadn't heard Kelly. Case didn't say, "I didn't hear you," and Kelly asked him at least three times why he had killed Anastasia, which is strong evidence he heard her.

■ Case claims that his response was not a declaration against interest and that, therefore, his response could not have been a tacit admission. Cases premise might be correct, but the conclusion does not follow. An admission by a party opponent and a declaration against interest, though conflated on occasion, *see, e.g., State v. Garner,* 103 S.W.3d 866, 871 (Mo. App.2003) (discussing an admission against interest), are distinct concepts. *Still v. Ahnemann,* 984 S.W.2d 568, 572 n. 1 (Mo. App.1999). If Case means to suggest that his statement was not relevant, he is incorrect. (Because such a suggestion is beyond the scope of the point relied on, it is also improper. *State v. Londagin,* 102 S.W.3d 46, 48 (Mo.App.2003).)

■ Regarding Cases second statement made on June 7, "I mean the only advice that I can give is start everything with I think, or the best I can remember is ... there," this court cannot see how this was a tacit admission. Not once during the second phone conversation did Kelly accuse (even indirectly) Case of murder. The two talk about getting "the story straight," which is either a veiled request for information or an attempt to cover-up what happened that night. But without an incriminating statement by Kelly, there can be no tacit admission by Case. Treat-

ing Case's second statement as a tacit admission was in error.

■■■■ The question remains: Was Case prejudiced as a result? The erroneous admission of evidence which does not amount to a constitutional violation is prejudicial if there is a reasonable probability that its admission was outcome determinative. *State v. Driscoll*, 55 S.W.3d 350, 356 (Mo. banc 2001). The test for prejudice is different where such evidence is cumulative of other properly admitted evidence, in which case the error must have been outcome determinative. *State v. Robinson*, 108 S.W.3d 689, 696 (Mo.App.2003); *State v. Bell*, 62 S.W.3d 84, 92 (Mo.App. 2001). *See also State v. Driver*, 912 S.W.2d 52, 56 (Mo. banc 1995). (If the erroneous admission of evidence was a federal constitutional violation, a still different standard applies: The State must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *State v. Whitfield*, 107 S.W.3d 253, 262 (Mo. banc 2003).) Here, Case's alleged tacit admissions were cumulative to the testimony provided by another witness. The jury heard Kelly testify that Case said, regarding his plan to kill Anastasia, "We [meaning Justin and he] have been talking about it all day, and Justin asked me to do it. And I want to do it, so I'm going to do it." The jury also heard Kelly testify that Case shot and killed Anastasia. Thus, Case was not prejudiced, *see Galindo v. State*, 30 S.W.3d 900, 904 (Mo.App.2000); *State v. McWhorter*, 836 S.W.2d 506, 508 (Mo.App. 1992), unless the recorded June conversation was outcome determinative. It was not.

In any event, the only error was in admitting the June 7th conversations, which, at worst, repeated, in a much milder form, Case's June 5th confession, a confession that itself wasn't nearly as in-culpatory as Kelly's eyewitness testimony. It is extremely unlikely that the jury would not have convicted Case but for Case's recommendation that Kelly, who had just told him she couldn't remember what happened the night of October 22nd, preface her statements to the police with "I think" or "the best I can remember," Case's June 5th confession combined with Kelly's eyewitness testimony did all the damage.

Case's explanation how he was prejudiced (an explanation that does not appear in the section of the brief dealing with alleged constitutional violations) is unsound. He says he was prejudiced because the admission of his two statements was an end run around his Fifth Amendment rights: a blatant *non sequitur*. An evidentiary error is not automatically a constitutional error. Even if the trial court violated Case's constitutional rights, it does not mean he was prejudiced as a result. Most constitutional errors are not prejudicial per se. 5 Wayne R. LaFave et al. Criminal Procedure § 27.6(c), (d) (3rd ed.2000). In any event, Case's constitutional rights were not violated. *See infra.*

B. Substantive Due Process and the Fifth Amendment

■■■■ The second prong of Case's point relied on is equivocal. On the one hand, it claims that admission of these tacit admissions was fundamentally unfair. On the other hand, it mentions the Fifth Amendment and in the argument section cites to *State v. Perkins*, 753 S.W.2d 567 (Mo.App. 1988), a Fifth Amendment case. The gravamen of Case's position, however, is that it is fundamentally unfair for the police to use a friend of a suspect to elicit statements from the suspect when the police know the suspect has retained counsel, especially when the police already had probable cause to arrest the suspect.

Because this argument was not preserved, review is for plain error. Rule 30.20. Accordingly, this court must deny this prong of Case's point unless it finds that the trial court committed error that would result in manifest injustice or a miscarriage of justice if the error were left uncorrected. *See State v. Mead,* 105 S.W.3d 552, 556 (Mo.App.2003).

 Fundamentally unfair state action is a violation of substantive due process. *Kinsella v. United States, ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960). Nevertheless, this court cannot consider Case's substantive due process argument, for when a specific Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims. *County of Sacramento v. Lewis,* 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (internal quotation marks omitted).

As noted *supra,* Cases complaint is that the police did an end run around his right to remain silent and his right to counsel, as guaranteed by the Fifth Amendment.[4] [T]he Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion. *United States v. Henry,* 447 U.S. 264, 272, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). *Accord Hoffa v. United States,* 385 U.S. 293, 304, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). *See also Alexander v. State of Connecticut,* 917 F.2d 747,

750–51 (2nd Cir.1990). *Cf. State v. McMullan,* 713 S.W.2d 881, 883 (Mo.App. 1986) (holding that trial court did not err in excluding statements elicited by sheriffs informant after defendant had been charged, had invoked his right to remain silent and right to counsel, and was in jail). Case had not been charged when he was talking to Kelly, so even if Kelly was a *de facto* police agent, *see State v. Perkins,* 753 S.W.2d 567, 571 (Mo.App.1988), there was no Fifth Amendment violation. *See also Illinois v. Perkins,* 496 U.S. 292, 300, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("[A]n undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response.").

 To be sure, the police were engaging in deception by having a friend of Cases record her conversations with him. But "[d]eception which takes advantage of a suspect's misplaced trust in a friend does not implicate the right against self-incrimination nor the fifth or six[th] amendment rights to counsel." *Alexander,* 917 F.2d at 751.

 Case might be right that the police had probable cause to arrest him in September 2000. But, there is no constitutional right to be arrested, and the police are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause. *Hoffa,* 385 U.S. at 310, 87 S.Ct. 408.

---

4. Case also hints at a Sixth Amendment violation, but when Kelly recorded their conversations, no charges had been filed against Case, so his Sixth Amendment right to counsel could not have been violated. *State v. Seibert,* 103 S.W.3d 295, 300 (Mo.App.2003). This opinion should not be treated as an endorsement of the police using undercover agents to question defendants who have been charged. *Cf. Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (holding that government may not use an undercover agent to circumvent the Sixth Amendment right to counsel once formal charges have been brought against a suspect).

Case's reliance on *State v. Perkins*, 753 S.W.2d 567 (Mo.App.1988), is misplaced. In *Perkins*, this court held that the admission of recorded telephone conversations between the defendant and his brother violated the defendant's Fifth Amendment rights. *Id.* at 573. *Perkins* is distinguishable. First, the defendant in *Perkins* had invoked his right to counsel before the police's agent initiated conversations with the defendant. Case never did so. Case's attorney did receive a letter, dated February 8, 1999, from an assistant prosecuting attorney in which the prosecuting attorney said, "In a previous conversation, you told me that your client had some reservations about giving a statement unless he was offered some protection from criminal prosecution." There is no reference to Case's having invoked his right to remain silent or his right to counsel. That this prosecuting attorney knew Case was wary about giving a statement does not necessarily mean that Case had invoked his Fifth Amendment rights.

Case did file a pre-trial motion to suppress statement he gave to the police after receiving this letter. In the motion, he argued that the statements were involuntary and that he had not been Mirandized before he made them, supposedly in violation of the Fifth Amendment. The trial court granted the motion, but did not decide the merits of Case's arguments. Rather, the State conceded that the statements had to be suppressed because the prosecuting attorney, in his letter to Case, had promised not to use any statements Case made in his statement to the police.

■ Second, Case was not in custody when he was questioned, unlike the defendant in *Perkins*, who was incarcerated for burglary and stealing charges at the time his conversation with his brother was recorded. *Id* at 571. In fact, Case was never taken into custody by the police.

*Miranda* rights cannot be anticipatorily invoked outside the context of a custodial interrogation. *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). *See also United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir.1999); *United States v. Grimes*, 142 F.3d 1342, 1348–49 (11th Cir.1998); *United States v. Bautista*, 145 F.3d 1140, 1151 (10th Cir.1998); *Alston v. Redman*, 34 F.3d 1237, 1242–51 (3d Cir.1994); *United States v. Thompson*, 35 F.3d 100, 103–04 (2d Cir.1994); *United States v. Wright*, 962 F.2d 953, 955 (9th Cir.1992). So even if Case had invoked his right to counsel sometime around February 8, 1999—the date of the letter sent to Case's attorney— that invocation, coming at least two years before Kelly questioned him, was premature.

■ A final distinction between *Perkins* and this case is that Case had not been charged with a crime when Kelly questioned him, whereas the defendant in *Perkins* had. As noted before, see *supra*, the Fifth Amendment does not prohibit the use of undercover agents to question a defendant unless charges have been filed against the defendant. *Henry*, 447 U.S. at 272, 100 S.Ct. 2183.

Did the trial court violate Cases Fifth Amendment rights by allowing the State to introduce evidence of his silence (We shouldn't talk about this) as substantive evidence of guilt? The U.S. Supreme Court has yet to decide this issue. *See Jenkins v. Anderson*, 447 U.S. 231, 236 n. 2, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) ("Our decision today does not consider whether or under what circumstances pre-arrest silence may be protected by the Fifth Amendment."). A plurality of federal courts of appeals has held that a defendant's pre-arrest silence cannot be used as substantive evidence of guilt. *Compare Combs v. Coyle*, 205 F.3d 269, 283 (6th

Cir.2000), *United States v. Burson,* 952 F.2d 1196, 1201 (10th Cir.1991), *Coppola v. Powell,* 878 F.2d 1562, 1568 (1st Cir.1989), *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1017 (7th Cir.1987), and *United States v. Caro,* 637 F.2d 869, 876 (2nd Cir.1981) ("[W]e are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief."), *with United States v. Oplinger,* 150 F.3d 1061, 1066–67 (9th Cir.1998), *United States v. Zanabria,* 74 F.3d 590, 593 (5th Cir.1996), *United States v. Rivera,* 944 F.2d 1563, 1568 (11th Cir.1991). Missouri, however, has adopted the contrary view. *State v. Kinder,* 942 S.W.2d 313, 326 (Mo. banc 1996) (citing *State v. Hornbeck,* 492 S.W.2d 802, 808 (Mo.1973)); *State v. Davis,* 963 S.W.2d 317, 327 (Mo.App.1997). Thus, even if this court were to interpret Cases statement, "We shouldn't talk about this," as silence for purposes of the Fifth Amendment, *see Wainwright v. Greenfield,* 474 U.S. 284, 295 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986) (noting that for purposes of the Fifth Amendment, silence is not limited to muteness), the trial court did not violate Case's Fifth Amendment rights by allowing the State to introduce evidence of his silence as substantive evidence of guilt.

## II.

■ Case next contends the State did not put on a submissible case because the State's key witness gave contradictory testimony that was not corroborated by other evidence, thus making her testimony worthless. If either of the premises of Case's argument (that the State's case rested solely on Kelly's testimony, that Kelly's testimony had to be corroborated because it was contradicted) is false, his attack on the sufficiency of the evidence is invalid. If both premises are true, this court must then decide whether the re-maining evidence created a submissible case, which is present if there was evidence from which a reasonable jury could have found Case guilty beyond a reasonable doubt of first-degree murder. *See State v. Bisans,* 104 S.W.3d 805, 807 (Mo. App.2003).

Case's claim that "all of the [S]tate's evidence rested on the contradictory and uncorroborated testimony of Kelly Moffett" is incorrect. The State did not rest its case on Kelly's testimony alone, but rather on her testimony in combination with Case's tacit admission of having killed Anastasia. Thus, one of the premises of Case's argument being false, his point relied on must be denied.

■ Assuming, for the sake of argument, that Case meant that Kelly's testimony was essential to the State's case, but not the sole evidence of guilt, his argument still fails. An out-of-court confession, such as Case's tacit admission of guilt, is not, by itself, sufficient to establish the *corpus delicti* (i.e., the commission of a crime by someone), *State v. Rehberg,* 919 S.W.2d 543, 550 (Mo.App.1995); however, if additional evidence implicating the defendant in the crime corroborates the confession, there is sufficient evidence both of the *corpus delicti* and of the defendant's guilt. *State v. Evans,* 992 S.W.2d 275, 285 (Mo. App.1999) ("Proof of the *corpus delicti* and [an] admission can be considered together and the sum of the two can go to prove the essential elements of the crime."); *State v. Fears,* 803 S.W.2d 605, 608 (Mo. banc 1991); *State v. Howard,* 738 S.W.2d 500, 504–05 (Mo.App.1987). As noted, Case's tacit admission of guilt was supported by Kelly's testimony. Case has not explained why, nor cited any authority holding that, the evidence corroborating his tacit admission of murder must itself be corroborated. This oversight on Case's part is sufficient

reason to deny this point relied on. *Sapp v. State*, 22 S.W.3d 746, 747 (Mo.App.2000).

Even if the State's case did rest entirely on Kelly's testimony, Kelly's testimony did not have to be corroborated to be probative. It is true, as Case claims, that Kelly's testimony was inconsistent with other testimony and with her pre-trial statements. Before trial, Kelly initially accused Justin, but on two later occasions, accused Case of having killed Anastasia. Thrice in 1997 and twice in 1998, Kelly told the police that the last time she saw Anastasia was when Anastasia got out of the car and walked away; at trial she testified that Anastasia did not get out of the car at the intersection and that she saw Case shoot Anastasia. Kelly testified that she had seen the murder weapon hanging on a wall in the home of Case's father, but, in an earlier deposition, she had said that she had never seen before. Kelly testified that she did not know if Case and Justin had been drinking because "they weren't acting drunk," but, in her statement to the police and in a deposition, she said the two smelled of alcohol and that Case was acting drunk.

Kelly's testimony also contradicted the testimony of other witnesses. She testified that Case told her that he and his father went hunting; Case's mother and paternal aunt testified to the contrary. Kelly testified that Justin cried and was acting incoherently after the shooting, but two witnesses who saw Justin the night Anastasia was killed said that he was acting normally and did not appear to have been crying.

Case's claim that Kelly's testimony about the shooting flatly contradicted the medical evidence is false. According to the medical evidence, the muzzle of the gun used to kill Anastasia was less than six inches away from her when she was shot, and if Anastasia's head had been perpendicular to the ground when she was shot, the angle of the gun would have been slightly upward. In her testimony, Kelly implied that Case shot Anastasia while he was standing up; however, it is entirely possible that before Case pulled the trigger, Anastasia tilted her head back. Case might also have shot Anastasia from a slightly crouching position; he had retrieved the gun from the trunk, which would require him to slouch down. Kelly did testify that Case was five feet away from Anastasia when he shot her, but she characterized her testimony about this matter as a "guesstimate." If the gun was three feet long and Kelly's guesstimate was off by two feet, then her testimony is consistent with the medical evidence that the muzzle was less than six inches from Anastasia when she was shot. Kelly's testimony about the shooting was not inconsistent with the medical evidence.

■ The insurmountable problem for Case is that, in general, the "testimony of a single witness, if deemed credible by the jury, may be considered sufficient for conviction, though that testimony is uncertain or inconsistent." *State v. Platt*, 496 S.W.2d 878, 881 (Mo.App.1973). *Accord State v. Gatewood*, 965 S.W.2d 852, 856 (Mo.App.1998). There are circumstances when a witness's testimony must be corroborated to be probative. *See infra.* None are present here. The testimony of an alleged victim of a sex crime must be corroborated only if "the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is thereby rendered doubtful." *State v. Sladek*, 835 S.W.2d 308, 310 (Mo. banc 1992) (internal quotation marks omitted); *State v. Kelley*, 83 S.W.3d 36, 43 (Mo.App.2002). But this case does not involve a sex crime, and Kelly was not the alleged victim in this case. Case invites this court to extend

this corroboration rule to non-sex crime cases, but this court has declined a similar invitation before, *State v. Barnes,* 980 S.W.2d 314, 320 (Mo.App.1998), and has been given no good reason to deviate from precedent. *See Connoley v. Beyer Crushed Rock Co.,* 355 Mo. 684, 197 S.W.2d 653, 655 (1946) ("[E]stablished precedents should not be ignored without good reason.")

■ Under the doctrine of destructive testimony or destructive contradictions, a witness's trial testimony that is marred by "rampant inconsistencies and contradictions" is not probative evidence. *State v. Goudeau,* 85 S.W.3d 126, 131–32 (Mo.App.2002). *Accord State v. Davison,* 46 S.W.3d 68, 79 (Mo.App.2001). The doctrine is *not* a corroboration rule; it does not apply "when the inconsistencies are (1) between at-trial testimony and pre-trial statements, or (2) between the testimony of one witness and another witness at trial." *Goudeau,* 85 S.W.3d at 131–32. The inconsistencies Case refers to fall into these latter two categories.

At one point, Kelly did appear to give contradictory testimony at trial. Asked, "[Was Anastasia] [a]ngry enough to get out of [Justin's] car, slam the door and walk away?" Kelly said, "I don't see how that—she used to get mad and leave the condo, but I didn't know her well enough to know she was going to get out." But this was only an apparent contradiction. The question dealt with whether Anastasia was angry enough to get out of the car, not whether she actually did. The jury could have reasonably concluded, as Case concedes, that Kelly intended to say that she didn't know Anastasia well enough to know "if" she was angry enough to get out of the car. Kelly's statement was likely a slip of

the tongue. *See State v. McNeal,* 539 S.W.2d 722, 727 (Mo.App.1976). At best, Kelly contradicted herself on once occasion, which does not satisfy the doctrine's requirement that the inconsistencies be "rampant." *Goudeau,* 85 S.W.3d at 131–32. *See also Rosen v. Nations,* 72 S.W.3d 267, 273 n. 3 (Mo.App.2002) ("The resolution of contradictions in a single witness's testimony is left to the sound discretion of the trial court as the finder of fact.").

■ Case next contends that Kelly was Case's accomplice, and, because of the inconsistencies between her testimony and other witness's at trial and between her testimony and her earlier out-of-court statements, her testimony was not sufficient evidence to convict Case unless it was corroborated. This argument appeared for the first time in Case's reply brief. This court is generally barred from considering arguments raised for the first time in an appellant's reply brief. *Williams v. Fin. Plaza, Inc.,* 78 S.W.3d 175, 181–82 (Mo.App.2002).

In any event, this argument fails because, as noted *supra,* the State's case did not rest entirely on Kelly's testimony, whether she was an accomplice or not. So the rule that an accomplice's testimony is insufficient by itself to prove guilt when the accomplice's testimony is so lacking in probative force as to preclude it from constituting substantive evidence, *State v. Galvan,* 798 S.W.2d 185, 188 (Mo.App. 1990), wasn't applicable.

■ Nor, apparently, was Kelly an accomplice.[5] Case's mother testified that Kelly told her that she (Kelly) was "an accomplice" to Anastasia's murder, but a witness's legal conclusions, especially a layperson's, are generally not binding on

---

5. Because Kelly was granted transactional immunity, this court's discussion of whether Kelly was an accomplice does not tread on

the prerogative of the executive branch to decide whether to prosecute Kelly as an accomplice.

the court. *See Howell v. Autobody Color Co.,* 710 S.W.2d 902, 905 (Mo.App.1986); *United States v. Baskes,* 649 F.2d 471, 478 (7th Cir.1980). In any event, the evidence strongly undermines any claim that Kelly was an accomplice, that is, "one who, before or during the commission of a crime, intentionally and knowingly aids or encourages the commission of a crime[.]" *State v. May,* 71 S.W.3d 177, 183 (Mo.App.2002). According to her testimony, Kelly, when she heard about Case's plan to kill Anastasia, said, "That's ridiculous. Why can't you just break up with her?" which indicates she was trying to dissuade Case from killing Anastasia. Kelly testified that she and Case discussed the impending killing and that she asked him questions about the killing (e.g., how and why he planned on killing her), but these actions were neither assistance nor encouragement. Kelly did make a phone call to help set up a meeting between Case and Anastasia, but (Case) unless she hoped or desired that by making the phone call she was helping Case achieve his diabolical goal—which was not the case—Kelly was not an accomplice. Mere knowledge that one's actions might facilitate the commission of a crime is not enough. *State v. Thompson,* 112 S.W.3d 57, 62 (Mo.App.2003) (accomplice liability for first-degree murder requires, among other things, proof that alleged accomplice's conscious purpose was that the victim die).

Case claims Kelly's bias—there was a $10,000 reward in Anastasia's case—and her inability to locate the murder weapon for the police make her testimony incredible as a matter of law. Case also implies that Kelly's testimony had no probative value because she was a crackhead alcoholic and because she said, in her June 5th call to Case, that her memory was unreliable from her taking too many drugs.

Besides exceeding the scope of his point relied on, these observations did not preclude the jury from reasonably believing Kelly's testimony. A person might be able recall a murder committed in one's presence, which is a very salient event, yet be unable to recall where the murder weapon was disposed of. It is also possible that someone may have retrieved the gun after Case had disposed of it.

 Regarding the reward: The jury could have believed Kelly, who said she had not even applied for the money and who said she did not come forward for the reward. In any event, bias does not make a witness incredible as a matter of law. (If it did, no civil suit supported only by the plaintiff's version of events could go to the jury.) That Kelly was a crackhead alcoholic would justify the jury in disbelieving her, but it did not make her testimony incredible as a matter of law. *State v. Booth,* 423 S.W.2d 820, 825 (Mo.1968) (holding that testimony of drug addict who had shot up twelve hours before and fifteen minutes before observing event about which he testified was not incompetent witness). *See also People v. Morey,* 304 A.D.2d 855, 759 N.Y.S.2d 191, 193 (N.Y.App.Div.2003); *United States v. Greenwood,* 974 F.2d 1449, 1458 (5th Cir. 1992); *United States v. Blackman,* 950 F.2d 420, 424 (7th Cir.1991); *United States v. Palacios,* 612 F.2d 972, 973 (5th Cir. 1980).

CONCLUSION

In sum: There was sufficient evidence to convict the defendant of first-degree murder and armed criminal action, and the trial court did not err in treating one of the defendants statements as a tacit admission. Admitting the second statement as a tacit admission was harmless error. The State did not violate Cases Fifth Amendment rights by having one of his

friends record conversations between the two and by introducing these conversations as substantive evidence of guilt.

The judgment of the trial court is affirmed.

All concur.