STATE of Missouri, Plaintiff–Respondent,

v.

Joel MOORE, Defendant–Appellant.

No. 26895.

Missouri Court of Appeals,
Southern District,
Division Two.

June 29, 2006.

Ellen H. Flottman, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Roger W. Johnson, Office of Attorney General, Jefferson City, for respondent.

KENNETH W. SHRUM, Presiding Judge.

A jury convicted Joel Moore ("Defendant") of manslaughter in violation of section 565.005 (RSMo 1978).[1] He was sentenced to seven years' imprisonment in the Department of Corrections. On appeal, Defendant challenges the sufficiency of the evidence because his "conviction rested solely on the word of an unreliable snitch who received a deal in exchange for his testimony." We affirm.

1. This case involves a homicide that occurred in 1982; thus, all statutory references are to RSMo (1978), unless stated otherwise.

## FACTS

Because this appeal is about the sufficiency of evidence, our review is governed by the following: We accept as true all evidence and reasonable inferences tending to prove guilt and disregard all contrary evidence and inferences. *State v. Carroll,* 41 S.W.3d 878, 880[2] (Mo.banc 2001). During the day of July 12, 1982, 15–year old Tammy Smith ("Victim") and her friend, Shonda Fields, hung out and "goofed off." That night, around 11:30, after returning home, Victim's mother told her to return a shopping cart to a local grocery store. When Victim left for the store, Shonda started home. This was the last time her family or friends saw Victim alive.

On August 12, 1982, Victim's decomposing body was discovered in an empty garage. Her jean shorts were "cut in the crotch area or torn" and "rolled up toward the waist." The zipper on the shorts had been ripped apart; Victim's shirt was "pulled up revealing her breasts." No other evidence, however, showed a sexual assault. An autopsy was performed even though "the body was very badly decomposed." The body was identified as Victim through her dental records, and death resulted from either "asphyxiation or some trauma to the neck area."

The crime went unsolved for the next twenty years. In 2001, officer Richard Counts ("Counts") of the Springfield, Missouri, police department began reviewing "cold ... homicide cases." In 2002, Counts caught a break in Victim's case when he received an anonymous letter, naming two people (Defendant and Doug Ryan) as persons possibly involved in her death.

Counts first contacted Ryan and interviewed him several times. During the first interview, Ryan revealed information that led Counts to believe "he knew more about the crime," but did not implicate Defendant. One week later (May 22, 2002), a second interview was conducted in which Ryan said that he had seen scratches on Defendant's face, but knew nothing about Victim's death.

On May 27, 2002, Ryan came in for a third interview and again denied knowledge of Victim's death, at least initially. However, Ryan began changing his story after he was questioned for six or seven hours. By the end of the interrogation, Ryan claimed that he stopped by the shop he and Defendant rented, saw Victim dead in the shower and Defendant in the bathroom, and helped clean up the shower area.[2] Even so, Ryan continued to deny he was involved in Victim's death.

On June 3, 2002, Counts arrested Defendant in Tucson, Arizona. As Counts questioned Defendant, he [Defendant] denied any knowledge or involvement in Victim's death, but claimed: "If I did it, I don't remember it" and "I had to be shitfaced [drunk] to do anything like that [murder]." The videotaped interview also revealed inconsistencies between that statement and his at-trial testimony.

In March 2004, Defendant's lawyer deposed Ryan. During the deposition Ryan denied knowing how Victim died or how she ended up in the vacant garage. This differed from his preliminary hearing testimony in which he claimed to have helped Defendant move Victim's body.

After this deposition, Ryan again changed his story when he spoke to the police on April 2, 2004. In that interview, Ryan said he had fondled and kissed Victim and Defendant raped her. Thereon, Ryan was charged with first-degree murder concerning Victim's death.

**2.** The shop was located just to the east of the garage where Victim's body was found.

In attempting to reach a plea bargain, Ryan offered another story, namely, that he was called by Defendant after Victim was dead to help him dispose of the body. After not receiving a "deal," Ryan made a "second proffer" where he told yet another version. This version was the same as his at-trial testimony and resulted in a plea bargain. The agreement provided that Ryan would plead guilty to manslaughter and receive a five to seven year sentence.

Ryan's at-trial testimony was as follows. He arrived at the shop around 6:30 P.M. and began working on his truck. About "11:00 or after," Defendant arrived at the shop with Victim. Defendant and Victim went to an office area, and ten to fifteen minutes later, Ryan walked in on them to see the two "talking, hugging, kissing, whatever." Ryan then returned to working on the truck, but came back to the office when he heard a scuffle and Victim say, "no, I don't want to do that." Ryan tried to help Victim free herself from Defendant's grasp, but the struggle continued.

Ryan tripped and fell, pulling Victim to the ground with Defendant on top of them both. As the fight wore on, Defendant ripped Victim's shorts in attempts to rape her, but was unsuccessful. After ten to fifteen minutes of fighting, Defendant grabbed a knife and stabbed Victim in the neck, killing her. Defendant then threatened Ryan and his family to prevent him from contacting the police. The two cleaned up the blood in the shop and dumped the body in the vacant garage.

The significant inconsistencies in Ryan's many stories were brought out on cross-examination by Defendant's lawyer. Defendant testified that he had nothing to do with Victim's death, i.e., his trial strategy was that Ryan was a liar. The jury chose to believe Ryan, but convicted Defendant of manslaughter rather than the charged second-degree murder. This appeal followed.

## DISCUSSION AND DECISION

■ Defendant's sole point relied on maintains the evidence was insufficient to support his conviction and sentence. He claims the conviction "rested solely on the word of an unreliable snitch" (Ryan). Defendant insists that, "in this sort of case," courts should require additional corroboration of the "snitch" testimony. To adopt Defendant's argument would require us to ignore precedent and expand well-established rules of law. This we cannot and will not do.

■ The general rule is that the testimony of a single witness, if found credible by the jury, is sufficient, competent evidence to sustain a conviction. *State v. Case*, 140 S.W.3d 80, 91[19] (Mo.App.2004); *State v. Goudeau*, 85 S.W.3d 126, 131 (Mo. App.2002). This general rule, however, has certain very rare exceptions. *See, e.g.*, *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995) (discussion of destructive testimony and corroboration concept); *Case*, 140 S.W.3d at 91–92 (same).

■ One such exception is the doctrine of destructive testimony or destructive contradictions. *Goudeau*, 85 S.W.3d at 131. "The rule provides that a *witness's testimony* loses probative value when his or her statements *at trial* are so inconsistent, contradictory, and diametrically opposed to one another that they rob the testimony of all probative force." *Id.* at 132; *see also Silvey*, 894 S.W.2d at 673. When, as here, the inconsistencies are between at-trial testimony and pretrial statements, the rule has no application. *Case*, 140 S.W.3d at 92[22]; *Goudeau*, 85 S.W.3d at 131–32. "This limitation on the destructive contradictions doctrine is provided to safeguard the prerogative of the jury to

believe or disbelieve the evidence put before it." *State v. Sutton*, 896 S.W.2d 543, 544 (Mo.App.1995).

■ The only inconsistencies here are those found in Ryan's pretrial statements versus his at-trial testimony. The doctrine of destructive testimony or destructive contradictions does not apply. *Goudeau*, 85 S.W.3d at 131–32. Such inconsistencies were properly left for the jury's consideration. *Silvey*, 894 S.W.2d at 673. The jury was free to believe all, some, or none of that evidence, and this court cannot upset that determination on appeal. *Goudeau*, 85 S.W.3d at 131. To the extent Defendant tries by his arguments to invoke the doctrine of destructive contradictions, the effort fails.

■ The second exception to the general rule is the so-called corroboration rule. *See Silvey*, 894 S.W.2d at 673. "Corroboration is not mandated unless the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is thereby rendered doubtful." *State v. Harris*, 620 S.W.2d 349, 353[5] (Mo.banc 1981). The corroboration rule appears to have originated in early forcible rape cases involving adults, but began to be extended by courts to all sex offense cases including those involving minors. *State v. Peters*, 186 S.W.3d 774, 2006 WL 88654 n. 4 (Mo.App. W.D.). The corroboration rule has been limited to "sex crime" cases even in the face of requests to extend it to other types of crimes. *Case*, 140 S.W.3d at 91–92.

Because the subject testimony here did not come from the victim and because this case does not involve the issues of sexual offenses, the corroboration rule does not apply and we decline Defendant's invitation to extend that rule. *Id.* Moreover, Ryan's testimony was not of the nature that it conflicted with "physical facts, surrounding circumstances and common experience." *Harris*, 620 S.W.2d at 353.

For instance, Ryan's explanation for lying to Counts during the first two interviews was that he wanted to protect himself and his family. That Ryan initially lied to Counts and his ultimate explanation for those lies is not something unexpected under the circumstances, i.e., being questioned twenty years after the crime and having kept his involvement secret from everyone, including his family, for such a long time.

The jury had before it the substantial inconsistencies and lies told by Ryan. The jury knew of his plea bargain. The jury listened to Defendant's videotaped statement and heard his at-trial testimony. The jury made a credibility determination to believe Ryan and disbelieve Defendant. That was their prerogative and is one this court will not upset. *Silvey*, 894 S.W.2d at 673; *Harris*, 620 S.W.2d at 354; *Goudeau*, 85 S.W.3d at 131–32. Point denied.

The judgment of conviction and sentence is affirmed.

GARRISON and BARNEY, JJ., Concur.